Claudia SMITH and Wilbert Walker, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**TOWER LOAN OF MISSISSIPPI, INC., et al., Defendants.**

No. CIV.A. 1:98CV212BrR.

United States District Court, S.D. Mississippi, Southern Division.

March 27, 2003.

Alfred Lee Felder, McComb, MS, Lawrence E. Abernathy, III, Attorney, Laurel, MS, Larry O. Norris, Hattiesburg, MS, Charles Richard Mullins, Coxwell & Associates, PLLC, Jackson, MS, Brian Wolfman, Amanda Frost, Public Citizen Litigation Group, Washington, DC, Andrew M.W. Westerfield, Westerfield & Janoush, Cleveland, MS, Dennis Harmon, Columbus, MS, Richard D. Stratton, Smith & Alspaugh, PC, Birmingham, AL, Gerald Wayne Hynum, Hattiesburg, MS, for Antonio Cole, Norris Class Pltfs., Mullins Class Pltfs., White Class Pltfs., Rebecca Crystian, Martha Shaffer, Anderson Class Plaintiffs, Christine Brooks, Martin Class Pltfs., Hynum Class Pltfs., plaintiffs.

William F. Goodman, Jr., Paul H. Stephenson, III, Patrick H. Scanlon, Watkins & Eager, Jackson, MS, Michael T. Parker, Sessums, Dallas & Morrison, Jackson, MS, Lawrence C. Gunn, Jr., Hattiesburg, MS, for Tower Loan of Mississippi, Inc., American Federated Insurance Company, American Federated Life, Insurance Company, defendants.

## MEMORANDUM OPINION

BRAMLETTE, District Judge.

### Introduction

This class action was originally commenced by Antonio Cole in May of 1998. The complaint and amendments thereto named, as defendants, Tower Loan of Mississippi, Inc., First Tower Loan, Inc. (hereinafter "Tower") as well as American Federated Life Insurance Company and American Federated Insurance Company, (hereinafter "American Federated"), which defendants responded to the complaint with their answers and counterclaims.

In July, 1998, plaintiffs filed a motion for class certification, and defendants cross-motioned for class certification. These matters were set for hearing on September 9, 1998.

Hereinafter the Court will reference a class action styled *Bryant Jones, et al v. First Tower Loan, Inc., Tower Loan of Mississippi, Inc., American Federated Life Insurance Company and American Federated Insurance Company* (hereinafter "Bryant Jones") which was lodged as Civil Action No. 2:96–cv–63–PG in the Hattiesburg Division of the United States District Court for the Southern District of Mississippi. The Jones case was a precursor to today's action wherein the plaintiff challenged loan/insurance practices of the defendants in terms almost

identical to those stated by Antonio Cole who, in time, was replaced as class representative by Claudia Smith and Wilbert Walker by order dated November 19, 2001.

### Findings of Fact

### The Bryant Jones Class Action

Because of the similarity of claims made by *Bryant Jones* and Antonio Cole, this Court, at various hearings, sought and received from counsel a history of the *Jones* litigation. As said, the complaint here and the *Bryant Jones* complaint are essentially the same. In September, 1996, the District Court in the Hattiesburg Division temporarily certified a class for settlement purposes in *Jones* at the request of the plaintiff represented by the Deakle Law Firm at Hattiesburg. From what this Court has been able to discern from solicited comments by counsel at various hearings in this case, as well as from documents filed herein, settlement negotiations resulted in a settlement agreement which focused on equitable relief with monetary relief also provided. This settlement agreement was preliminarily approved by the District Court which certified it under Rule 23(b)(1)(A),(b)(1)(B) and (b)(2). This proposed settlement was aborted, followed by a second settlement agreement which came approximately six months later and which also failed when class counsel filed a motion to decertify, which motion was granted.

The *Bryant Jones* complaint which, as said, is almost identical to the Cole complaint sought Class Certification. In order to better understand what appear to be antithetical positions of the Jones group represented by the Deakle Law Firm which group now opposes the relief sought by Cole, the Court, at one of the hearings, made inquiry of all counsel regarding this matter. No satisfactory explanation was provided.

As this Court faced in the early days of this proceeding, the Hattiesburg District Court also considered the prudence of allowing substantially similar actions filed in State Court to proceed. As was true here, the Hattiesburg Court issued an injunction prohibiting parallel legal actions against Tower for a period of time, following which injunctive period, numerous claims were filed against Tower in Jefferson and Claiborne counties of this State. These and other State Court complaints then and now attack policies and practices implemented by Tower, and they seek equitable relief and monetary award. These actions have been stayed by this Court.

It should be mentioned that in conjunction with the dismissal of the class allegations, the District Court in *Bryant Jones* entered an order continuing the injunction prohibiting parallel legal actions against Tower for forty-five days. Notwithstanding, former class counsel in *Bryant Jones* filed similar actions in two state court cases approximately eleven days later. (Parker, 8/27/02 Tr. p. 81–82; exh.D–3(n);exh.D–3(o)) One complaint (*"Arbuthnot,"*, exh. D–3(n))joined the identical claims of 339 Tower borrowers in the Circuit Court of Claiborne County, Mississippi. The other complaint (*"Barnes,"* exh. D–3(o)) joined the identical claims of 317 Tower borrowers in the Circuit Court of Jefferson County, Mississippi. The state court complaints contain a summary description of the actions virtually identical to the summary description appearing in both *Bryant Jones* and in this case, but for the deletion of the federal law allegations.

*Arbuthnot* and *Barnes* are not the only pending state court challenges of policies and practices of Tower and American Federated. A series of ten similar actions were filed in four different state courts. (Exh. D–3(a) thru D–3(j)) (hereinafter the "Norris/Sakalarios" actions or complaints) [1] Again, these state court actions track virtually verbatim the allegations of the class complaint here.

Fundamental to the *Arbuthnot, Barnes,* Norris/Sakalarios and other state court complaints is the general challenge of how Tower does business. All of the state court com-

---

1. Because of the number of substantially similar state court actions and objections to the pernding settlement, a feasible way to sometimes identify complainants and objectors is often by reference to their counsel. In this instance, Larry Norris and Anthony Sakalarios were the counsel filing the referenced complaints. Messrs. Norris and Sakalarios also filed the *Pitts* state court action. (Exh. D–3(k))

plaints attack policies and practices uniformly implemented by Tower, *i.e.*, conduct which is also challenged in the subject class action complaint. Each lawsuit centers on whether Tower can rely on the language of its standard loan documents.

Most of the state court actions directly seek injunctive relief and virtually all demand some form of equitable relief. Indeed, the Norris/Sakalarios complaints specifically request five different state courts for, among other things, orders (i) enjoining Tower from procuring insurance for "plaintiffs and others as well as future borrowers"; and (ii) requiring Tower to terminate all insurance placement "unless and until the proposed plan is submitted to and approved by the court." (Exh. D–3(a) thru D–3(k), count XII) [2]

### The Complaint

Before the Court is a class action amended complaint setting forth numerous challenges to the lending and insurance practices of Tower and American Federated. Plaintiffs have charged that Tower engaged in a pattern of practice to defraud its borrowers by forcing them to purchase insurance by deceitful means. These misleading loan disclosures, coercive marketing practices and the requirement of insurance placement on property which is essentially valueless, constitutes what has come to be known in the industry as "packing". Additionally, Tower was accused of "flipping", a term which identifies a practice of encouraging the borrower to pay off a loan prior to maturity date, resulting in an alleged ingenious method of calculating insurance and interest refunds highly disadvantageous to the customer. These practices are facilitated by the "captive" insurer allegation which claims that American Federated is the alter ego of Tower Loan.

There are numerous other allegations, as well, including violations of the Federal Truth–in–Lending Act, the Federal Fair Debt Collection Practices Act, the Civil Rights Act of 1991, the Mississippi Small Loan Regulatory Act and including allega-

tions of mail fraud, statute violations, antitrust law violations and others.

The complaint seeks declaratory, injunctive and equitable relief, restitution, punitive damages and compensatory damages.

### The September 9, 1998 Hearing

### Certification Opinion and Order

On September 9, 1998, the Court conducted a hearing on plaintiffs' motion and defendants' cross motion for class certification. The Court found class certification to be warranted under Rule 23(b)(1)(A). In addition and alternatively, the Court certified the Class under Rule 23(b)(2) and further in the alternative under Rule 23(b)(1)(B). The Court declined to certify the Class under Rule 23(b)(3). The Court defined the Class to consist of the following:

> All persons who became obligated to pay any premium or other costs of insurance written by American Federated Companies in connection with loans made by Tower Loan Companies in Mississippi during the period February 15, 1993, through September 9, 1998, or who have asserted or assert claims against American Federated Companies or Tower Loan Companies concerning any premium or other costs of such insurance (except for persons who have settled their claims).

In certifying the Class under Rule 23(b)(1)(A) the Court concluded:

> This controversy squarely falls under Rule 23(b)(1)(A). For example, Tower is required by both law and practical circumstances to deal with its legions of borrowers the same way. The comprehensive federal and state regulatory frameworks apply across the board. There is no feasible way for Tower to do business without standardized procedures. The thrust of Cole's action is for equitable relief coupled with a demand for punitive damages flowing from a requested judicial condemnation of Tower's uniform way of doing business.
>
> Separate and multiplicative lawsuits have already materialized.... With one

---

**2.** In addition to the above-referenced *Bryant Jones* and state court actions, the Chapter 13 bankruptcy trustee has petitioned for authority to

pursue an insurance "packing" and "flipping" action on behalf of Tower debtors in bankruptcy. (Exh. D–7, ¶ 3, n. 2)

exception, every one of these parallel lawsuits alleges insurance packing premised on the claim that buying insurance was improperly made a condition of the loan. Moreover, every lawsuit without exception challenges the reasonableness of insurance premiums and most question other loan terms and the method of calculating insurance premium and finance charge refunds.... Resolution of every controversy thereby turns on the adequacy and enforceability of Tower's loan documents as well as the effect of compliance with regulatory guidelines by Tower and the American Federated Companies. Virtually every parallel action seeks injunctive relief.... Furthermore, just like Cole, some 68 plaintiffs in five different state courts have specifically demanded a court-ordered plan establishing future procedures for insurance placement.

In support of its Rule 23(b)(2) certification we made the following findings:

Certification under Rule 23(b)(2) is not precluded because the

class also seeks money damages. "Class certification under Rule 23(b)(2) does not automatically preclude an award of monetary damages when the primary relief sought is injunctive or declaratory." ... The test is whether the request for equitable or declaratory relief predominates.

....

The equitable and declaratory relief sought by Cole and the class predominates under [the] criteria [established by the Fifth Circuit in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir.1998)]. The monetary relief sought by Cole is actually outside the Rule 23(b)(2) discussion in *Allison* which addressed the extent to which *nonequitable* monetary relief may be obtained in a(b)(2) proceeding.... Cole seeks the restitution and disgorgement by defendants of the insurance premiums and related charges allegedly unlawfully collected. As such, the demand is not in the nature of damages but is instead an extension of the equitable remedy.... Rule 23(b)(2) is readily applicable.

Even if the monetary relief sought by the class were termed nonequitable, (b)(2)

certification would nonetheless remain appropriate. Such "damages" would be "incidental" under *Allison*. Cole argues for certification on the ground that "the amounts due the individuals under [the] circumstances [alleged in the amended complaint] are generally so small that these are considered to be 'negative value' cases." ... Further, it is not just that the amounts allegedly due each individual class member are very small. Such amounts are not individualized claims under *Allison* .... These amounts are readily capable of computation by following. the objective standards of calculating the amounts of insurance premiums charged plus the associated finance costs. Such a determination is not at all dependent on intangible, subjective differences among Class Members. Nor do Cole's fundamental claims require additional hearings for each individual's case. The amounts sought by the class are truly in the nature of a group remedy.

### The September 9, 1998 Stay Order

Following announcement of its determination that the proposed Class would be certified under Rules 23(b)(1) and (b)(2), the Court then considered Tower's motion to enjoin and stay parallel proceedings. The Court recognized that it had certified this action "as a mandatory class action." Consistent with this intent and pursuant to the All Writs Act, the Court granted Tower's motion "in order:

to conserve judicial resources;

to properly protect the court's jurisdiction over this class action, and to enforce and effectuate the order of certification;

to eliminate the risk of inconsistent or varying adjudications which may subject defendants to incompatible standards of conduct;

to prevent the prosecution of other actions that would frustrate the court's efforts to consider, oversee and decide this entire complex controversy, or perhaps eventually to craft a classwide settlement;

to eliminate the risk of inconsistent or varying judgments that may affect the

rights of Class Members and impair their ability to protect their interests;

to preclude the risk of other actions so interfering with the court's consideration or disposition of this action as to impair the court's flexibility and authority;

in light of the court's determination that the class has been properly certified, to channel the litigation in its entirety to this Court and thereby to utilize the class action mechanism as the ideal means for resolving the claims at issue; and

to achieve the ends of justice entrusted to this Court."

The order enjoined the commencement of actions related to the subject matter of this class action. The Court also specifically stayed the state court actions pending against Tower.

### Appeal of the Certification and Stay Orders

Following the September 1998 hearing and the orders which followed, various motions were filed including motions for and on behalf of the clients of Mr. John Deakle, Mr. Michael Sims, Mr. Larry Norris, and Mr. Anthony Sakalarios. These motions were on behalf of class members who were also state court plaintiffs seeking a lift of the stay regarding parallel proceedings and/or permission to intervene. It is the recollection of the Court that these matters were ripe for briefing and a scheduled hearing. At this point in time the Deakle Group perfected an appeal to the Fifth Circuit regarding the September 9, 1998, class certification order, together with the order staying parallel proceedings. The effect of the appeal was that all proceedings before this Court were held in abeyance until the July 13, 2000 remand from the Fifth Circuit ruling which held that the District Court did not abuse its discretion in staying parallel proceedings. Prior actions of this Court were not disturbed by the Appellate Court which also declined to exercise jurisdiction over the class certification issue.

### Hearing of September 20, 2001

Following remand, the Court scheduled a hearing for September 20, 2001, wherein all litigants were invited to participate and to present their respective positions concerning class certification, including the presentation of evidence, and oral argument. The purpose of this hearing was to refresh the Court on all matters pending and to provide the litigants an opportunity to state their positions on class certification. By this time motions to reconsider class certification and/or for leave to intervene were on file for clients of Mr. Matt Abbott and Mr. Merrida Coxwell. At the hearing Mr. Larry Norris, on behalf of class members represented by him, submitted affidavits of borrowers, and Mr. Sakalarios took the stand and testified regarding practices of Tower Loan which he considered to be an infringement upon the rights of his clients. Essentially, complaints voiced by Mr. Sakalarios are those stated in the complaint by the class representative.

Following the hearing, the Court on September 28, 2001 entered an order denying the motions to lift the stay on parallel proceedings and reserved the right to reconsider the ruling at a future time in conjunction with motions and other matters being filed in this case.

At sometime prior to the September 20 hearing the Court had become aware of the decision by the United States Supreme Court in *Ortiz v. Fibreboard Corporation,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). This decision gave the Court concern regarding class certification under Rule 23(b)(1)(B). Responding to this concern, the parties jointly moved the Court to rescind the class certification under this rule, and on December 3, 2001, the Court entered an order granting the motion and continuing certification under Rules 23(b)(1)(A) and (b)(2).

### The Class Action Settlement Agreement

Although the undersigned did not participate in settlement negotiations, the Court was aware that the claims stated in the Antonio Cole complaint were the same as those of *Bryant Jones.* The Court, as hereinabove stated, was also aware that *Bryant Jones,* as class representative, had reached a settlement with the defendants which was eventually thwarted by concerns and/or aspirations which are not yet entirely clear to this Court.

Secondly, the Court was aware that Chief Magistrate Judge John Roper who was familiar with the *Bryant Jones* settlement proceedings, made himself available in this case, in compliance with local rules, to assist in negotiations for an amicable resolution of all matters. These discussions were ongoing for many months. They included numerous sessions, and were both contentious and productive, resulting in settlement terms which are subject to the approval of this Court. Throughout, Tower and American Federated maintained that they had been in full compliance with all Federal and State law in a highly regulated consumer finance and insurance industry, while class representatives and counsel, all according to information provided at the fairness hearing, continued to embrace all matters set forth in the their complaint. Summarily, the parties announced that a settlement agreement had been reached, they tendered the agreement to the Court and sought preliminary approval.

## Settlement Terms

*Class Definition:* The Settlement Agreement contemplates that the Class will continue to be defined as set forth in the Court's December 3, 2001 amended order of class certification. The parties seek final certification of the Class under Rules 23(b)(1)(A) and (b)(2) to achieve full, complete and final settlement of all claims of all Class Members. The Class appears to consist of approximately 103,000 persons.

*Equitable Relief:* The Settlement Agreement provides first and foremost for extensive injunctive relief over a five-year period. The 70 different remedial provisions plus multiple standardized document attachments address virtually every fundamental aspect of making loans on which credit life, credit disability or property insurance may be placed. Numerous provisions ensure comprehensive, understandable disclosures to, and meaningful choices for, the borrower concerning insurance availability, cost and coverage alternatives if insurance is desired, and the financial implications of loan renewals and refinances. Industry experts credibly maintain Defendants have made numerous concessions beyond what the law arguably requires.

*Monetary Relief:* The Settlement Agreement provides for monetary relief characterized as compensatory damages, punitive damages, special payments and attorneys' fees. Total monetary relief exceeds $7.5 million.

*Compensatory and Punitive Damages:* For purposes of paying compensatory and punitive damages, the Settlement Agreement distinguishes Class Members according to whether they have ever been a sole obligor on a loan as opposed to a co-borrower, whether they borrowed money more than once during the Class period, and whether they received insurance benefits. Sole obligors receive twice as much in compensatory damages and in punitive damages as do borrowers who were never sole obligors. Repeat borrowers receive more in punitive damages than nonrepeat borrowers. Borrowers who benefited from payments under insurance policies do not participate in the compensatory or punitive damages funds. Total compensatory damages payments are projected to exceed $2.23 million; total punitive damages payments are anticipated to be greater than $4.39 million.

*Special Payments:* In light of the procedural history of this controversy, the Settlement Agreement provides for a special payments fund for present and former Class Representatives and certain state court plaintiffs. The fund totals $45,500. Present Class Representatives Smith and Walker and Class Representatives in the *Bryant Jones* action are to each receive $2,500. Class Members who were plaintiffs in related individual actions at the time the district court in *Bryant Jones* stayed such actions are to each receive $1,000.

*Attorneys' Fees:* The Settlement Agreement provides for defendant payment of such attorneys' fees as may be established by the Court up to $900,000. Class Counsel may not seek more than $900,000 in fees. Moreover, the Court is afforded the discretion to allocate reasonable attorneys' fees among Class Counsel, former class counsel in *Bryant Jones,* and any other attorneys determined to have made a material contribution

to the settlement of this action. Under the Settlement Agreement, however, total attorneys' fees in the aggregate may not exceed $900,000 no matter how allocated by the Court.

*Administrative Costs:* The Settlement Agreement imposes responsibility on Tower and American Federated for payment of the considerable costs and expenses associated with settlement implementation. Such costs include, but are not limited to, the costs of mailing settlement notices to every Class Member, publishing notice, mailing distribution checks to Class Members, and Settlement Administrator fees. All of such costs are over and above the $7.5 million in monetary relief described above.

### Preliminary Court Approval and Notice of the Settlement

Essentially, the proposed settlement contemplates that the class will continue to be defined as set forth in the Court's December 3, 2001 amended order of class certification. The Settlement was preliminarily approved on April 16, 2002, by order which directed the issuance of notice to the class and the scheduling of a fairness hearing. The class was continued as previously defined and was certified as a mandatory class pursuant to Rule 23(b)(1)(A) and Rule 23(b)(2). The parties were directed to issue notice both by mail and publication. The form of notice which adequately explained the provisions of the settlement and also advised class members of their right to object, was approved by the Court. The Settlement Administrator in an order of April 16 from the Court, was directed to cause the Notice of Settlement to be mailed on or before May 3, 2002, to all class members, using the last known address obtainable from the defendants' records. The Court further directed the Settlement Administrator to cause the Notice of Settlement to be published in eleven different newspapers.

The Settlement Administrator utilized the services of DMCS/Sourcelink, the largest mail production facility in the State of Mississippi, to assist in the mailing of the Notice of Settlement. On May 3, 2002, over 100,000 Notices of Settlement were mailed to class members. In August of 2002, however, errors were discovered associated with these mailings. Due to a previously undetected computer software deficiency at DMCS/Sourcelink, duplicate mailings were made to approximately 34,684 class members, and no Notice of Settlement was mailed to approximately 36,370 class members.

The Notice of Settlement was duly published once in the designated newspapers as directed by the Court. Notice by publication was fully achieved without error.

Class counsel and defendants advised the Court before the scheduled fairness hearings of August 27, 2002 of the errors in mailing of the Notices of Settlement. In light of the substantial preparations already undertaken by the Court, the parties, and objecting class members, the Court proceeded with the August 27 hearing. The Court recognized, however, the likely necessity of a second hearing to permit mailing of supplemental notice to class members to whom no Notice of Settlement had been mailed.

The Court conducted the hearing on the Settlement on August 27, 2002. At the conclusion of the presentations of objecting class members, the Court recessed the hearing for continuation on a date to be determined by the Court after issuance of supplemental notice.

On September 18, 2002, the Clerk entered the Court's order directing issuance of supplemental notice to the Class in conjunction with the resumption of the settlement fairness hearing on December 9, 2002. Specifically, the Court directed that supplemental notice be mailed to those class members to whom the previous notice was not mailed and for whom defendants had address information, or as to whom a mailed original notice was returned as "undeliverable." The Court further directed the republication of notice on two more occasions in the same eleven newspapers previously utilized. The Court approved the form of supplemental notice to be mailed and published.

The Court's September 18 notice directives required searches for more current addresses through the National Change of Address Program, and to the extent that process was

unavailing, through a consumer reporting service such as Equifax which uses social security numbers in the search process. Such searches were conducted and the mailing of supplemental notices proceeded.

Tower and the Settlement Administrator again utilized the services of DMCS/Sourcelink to assist in the mailing of the Supplemental Notice of Settlement. On October 1, 2002, the Settlement Administrator, with the assistance of DMCS/Sourcelink, caused the mailing of supplemental Notice of Settlement to the 36,370 class members to whom notice had not previously been mailed. Thereafter, DMCS/Sourcelink advised the Settlement Administrator that a computer field combination error resulted in 9,775 of the above 36,370 supplemental Notices of Settlement being mailed with incomplete addresses. The Settlement Administrator, through DMCS/Sourcelink, promptly rectified the computer field combination error and caused the remailing of the 9,775 supplemental Notices of Settlement on October 18, 2002.

The supplemental Notice of Settlement was duly published twice in each of the designated eleven newspapers as directed by the Court. Due to an error by the Northeast Mississippi Daily Journal, publication of supplemental notice actually occurred three times in that newspaper. Notice by publication was otherwise fully achieved without error.

Out of the 36,370 supplemental Notices of Settlement mailed on October 1, 2002, and the 9,775 supplemental Notices of Settlement remailed on October 18, 2002, approximately 20,000 Supplemental Notices of Settlement were returned as "undeliverable." Under the Settlement Agreement as preliminarily approved by the Court, there is no obligation to make a second mailing in those instances when the Notice of Settlement is returned "undeliverable." Nevertheless and even though notice by publication was properly accomplished, class counsel and defendants sought authorization for a second mailing of notice to those class members to whom the original Notice of Settlement was not mailed and as to whom the supplemental Notice of Settlement was returned as "undeliverable." By order dated November 6, 2002, the Court directed such a second mailing of supplemental notice to certain class members.

Tower and the Settlement Administrator similarly again employed the services of DMCS/Sourcelink to accomplish the second mailing of supplemental notices. Updated addresses were obtained for approximately 15,680 class members. Supplemental Notices of Settlement were mailed to such Class Members on November 20, 2002.

Thus, the Notice of Settlement was published in eleven newspapers throughout the State of Mississippi and the supplemental Notice of Settlement was published on two other occasions in those same newspapers for a total of three separate statewide publications of either the original Notice or supplemental Notice of Settlement as directed by court orders. In addition, each class member for whom an address was available was mailed an original Notice of Settlement or supplemental Notice of Settlement. Further, if either the original Notice of Settlement or the supplemental Notice of Settlement, was returned as "undeliverable," a more current address was sought through the National Change of Address Program and, if that process did not result in a more current address, through Equifax, a nationally-known consumer reporting service. If either of those services revealed a new or different address, the original Notice or supplemental Notice of Settlement was mailed to the new address.

As of December 5, 2002, either the original Notice or supplemental Notice of Settlement had been mailed to 90,686 class members without being returned as "undeliverable." Approximately 87.65% of the 103,468 class members were served with the original Notice or supplemental Notice of Settlement by United States mail.

### Objections to the Settlement

Class members submitted "position statements" in varying forms in response to the original and supplemental Notices of Settlement. Approximately two dozen class members submitted responses without the apparent assistance of counsel. Ten class members filed purported "request for exclusion: from the class without providing any

explanation for exclusion." In another instance one lawyer wrote the Clerk and attached a list of several hundred persons whom the lawyer asserted were individuals wishing to object to the settlement. There were no specific grounds stated.

Various groups of class members have filed objections through counsel alleging grounds in opposition to the Settlement. These groups may be identified as follows:

(a) One group of objectors consists of 693 class members who filed both objections to the Settlement and a "motion to opt out of the Settlement." These class members are represented by former *Bryant Jones* class counsel in the state court actions filed on the heels of the collapse of the *Bryant Jones* settlement.

(b) Clifton Gray and Larry Pickens, through the same counsel representing the above referenced 693 class members, have sought to intervene here as substitute class representatives. Messrs. Gray and Pickens have also joined in the objections to the Settlement filed by the above referenced 693 class members.

(c) Rastus Hathorne and 67 other class members who are plaintiffs in the Norris/Sakalarious state court actions have filed objections to the Settlement.

(d) Pam White, 33 other class members and the bankruptcy Chapter 13 trustees for the Southern and Northern Districts of Mississippi have submitted objections to the Settlement. These class members are parties to a substantially similar state court action and the bankruptcy trustees seek to pursue identical actions on behalf of Tower debtors in bankruptcy.

(e) Class members Rebecca Crystian and Martha Shaffer have filed a motion to "opt out" of the class. Ms. Crystian and Ms. Shaffer are plaintiffs in the *Barnes* state court action where they are represented by former *Bryant Jones* counsel.

(f) Leroy Calvert, Jr. and 10 other class members have filed objections to the Settlement substantially similar to those of the Pam White group.

(g) Annie Mae Alexander, Leroy Anderson and Earl Appleberry submitted objections to the Settlement.

(h) The foregoing objections were filed before the August 27, 2002 fairness hearing. On November 22, 2002, Randolph Sullivan and 79 other purported class members filed objections in conjunction with the resumption of the fairness hearing on December 9, 2002. The Sullivan group did not urge any objections not otherwise already of record.

(i) Della Mae Allen and 32 other purported class members filed a "motion to opt out" of the class following the issuance of supplemental notice.

The objections urged by the objectors identified above in paragraphs (a)—(d) and (f)—(h) largely parrot one another. No objector maintains this controversy should not have been certified as a class action proceeding. Except for Messrs. Gray and Pickens, all contest, however, the certification of a mandatory class.

Class member Christine Brooks seeks to "opt out" of the class based on contentions that her individual claim is for the alleged bad faith failure to pay insurance benefits. Counsel for Ms. Brooks orally represents that she does not contend the defendants engaged in unlawful insurance "packing" or "flipping." Ms. Brooks state court complaint never alleges, however, an insured loss for which benefits were never paid. Moreover, her state court complaint contains two counts addressing allegedly excessive charges for credit life insurance premiums.

There appear to be approximately 1,200 persons who have objected to or sought to opt out of the Settlement. The class consists of over 103,000 members. Thus, only approximately 1.2% of the total class opposes the Settlement or seeks to "opt out" of the Settlement.

Out of the above 1,200 persons, the group of 693 objectors, Mr. Gray, Mr. Pickens, Ms. Crystian and Ms. Shaffer are represented by former *Bryant Jones* counsel in the copycat state court proceedings filed concomitantly with abandonment of the *Bryant Jones* settlement. Another 68 persons are parties to the Norris/Sakalarios state court actions

which are virtually identical to this class action proceeding. The 38 persons forming the Pam White group are also parties to a substantially similar 1998 state court action. Thus, approximately two-thirds of the objectors are represented by counsel seeking to leverage identical claims under liberal state court joinder practices in carefully selected state court forums.

The only affidavits submitted by objecting class members were those of Clifton Gray, Larry Pickens, Annie Mae Alexander, Larry Anderson, Earl Appleberry, Rebecca Crystian and Martha Shaffer. None of the affidavits sets forth any alleged unique, individual circumstances. Indeed, Messrs. Gray and Pickens seek to serve as substitute class representatives. Ms. Crystian and Ms. Shaffer are multiple repeat borrowers. Ms. Crystian borrowed from Tower as recently as 2001; Ms. Shaffer has an existing relationship with Tower and American Federated today.

### Fairness Hearing

In accordance with the notice, a fairness hearing was held on August 27, 2002. Multiple exhibits were produced, and witnesses were called by the defendants in support of the Settlement, and they were cross-examined by counsel for objectors. Counsel for the above-identified group of 693 objectors, the Rastus Hathorne group, the Pam White group, the Annie Mae Alexander group, the bankruptcy trustees, Mr. Gray, Mr. Pickens, Ms. Crystian, Ms. Shaffer and Ms. Brooks appeared at the August 27 hearing. While they elected not to call any witnesses, objectors' counsel, as said, cross-examined the witnesses called by Defendants in support of the Settlement. Counsel presented legal arguments challenging the mandatory participation aspect of the class certification and the predominance of injunctive relief. They challenged the sufficiency of the Notice of Settlement. All counsel were afforded liberal opportunities to be heard.

Counsel for the objecting class members argued that each of their clients is a victim of the institutionalized and improper predatory lending practices—packing and flipping and other such conduct. At the hearing the Court was concerned as to whether counsel would be able to identify any individual claim

which, from a compensatory damage perspective, would justify incurring expenses associated with litigation. From arguments presented, the Court discerned that these individual cases, should they proceed in state court, would be joined under liberal state procedural rules allowing a confluence of plaintiffs and as one lawyer put it, " that's what plaintiffs' lawyers do in the State of Mississippi in state court." (See Transcript of 8/27/02, p. 287–288)

The Randolph Sullivan group first appeared at the December 9, 2002 hearing. Counsel for the Randolph Sullivan group, like other objectors' counsel, elected not to call any witnesses to address the Settlement. The Della Mae Allen group did not appear at the December 9 hearing. Other than counsel for the Randolph Sullivan group, the only other objectors' counsel who appeared at the December 9 hearing were counsel for the Pam White group.

### Conclusions of Law

■ Judicial approbation of a settlement agreement in a class action must not be granted unless the court concludes with certainty that hereinafter discussed factors are achieved. Rising to the top of all considerations is the best interest of class members. The class action phenomenon is a useful tool, but in today's litigious environment it also presents a unique opportunity for lawyers to engage in activities which are motivated more by their own self-interest than by the welfare of those whom they represent. Are the class action and settlement agreement pretextual in the sense that they are mere vehicles for the transfer of wealth into the pockets of counsel or, on the other hand, are the terms of the settlement fair, adequate and reasonable and based on the rule of law? Are the class members twice victims, first of the activities complained of in the suit and secondly at the hands of self-serving class counsel? Moreover, is the settlement a product of collusion between the parties? Mindful of the possibility of these motivations, the Court has carefully examined all of the documents, has conducted various hearings to engage counsel and witnesses in an effort to discover the facts. For the reasons hereinaf-

ter set forth this Court has come to the conclusion that the settlement is fair, reasonable and adequate.

## Fairness Hearings

### The Adequacy of Notice

■ According to the *Manual for Complex Litigation (Third)* (§ 30.212), Rule 23(e) notice of a proposed class action settlement should:

(1) describe the essential terms of the proposed settlement;

(2) disclose any special benefits provided to the class representatives;

(3) provide information regarding attorneys' fees. . . .;

(4) indicate the time and place of the hearing to consider approval of the settlement, and the method for objecting to (or, if permitted, for opting out of) the settlement;

(5) explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set out those variations; and

(6) prominently display the address and phone number of class counsel and the procedure for making inquiries.

Applying these factors to the Notice of Settlement provided in this case, both the original as well as the supplemental notice, the Court finds that the above prerequisites were met. The Notice of Settlement as mailed and published complied with the Court's directives under Rule 23(e) concerning the compromise and dismissal of this proceeding. The Notice of Settlement adequately (i) defined the class; (ii) identified the parties; (iii) described the parties' claims and defenses; (iv) summarized the terms of the proposed settlement; (v) disclosed class counsel's intent to apply for fees; (vi) announced the settlement hearing; (vii) disclosed the means for objecting to the settlement; and (viii) prominently displayed the address and phone number of class counsel with an accompanying invitation for inquiries concerning the notice and settlement.

The Notice of Settlement (both the original and supplemental notice) contained and properly stated all of the essential elements necessary to satisfy any due process concerns regarding the content of the notice. The manner in which notice was disseminated satisfied due process. The Court finds that reasonable efforts were expended to afford individual class members actual notice by mailing. Repeated publication of the Notice of Settlement in numerous newspapers throughout the State of Mississippi met all due process requirements.

Mailing supplemental notice to class members who were not mailed the original notice gave them an opportunity to submit objections to the Settlement at the second fairness hearing held on December 9, 2002, together with the opportunity to participate therein. Thus, class members were afforded all rights granted them under Federal Law and under the Federal Rules of Civil Procedure.

Having found that the notice procedures followed in conjunction with the August 27, 2002, and the December 9, 2002, hearings adequately afforded all class members an opportunity to be heard concerning the fairness, adequacy and reasonableness of the proposed Settlement, the Court finds that their rights under the Constitution, under Federal Law as well as under the Rules of Civil Procedure were adequately protected.

### The Settlement Agreement

There appeared to be no well defined standards for judicial implementation concerning the approval of class settlements either under Rule 23(e) or under other Federal Rules and law. Courts, nevertheless, have determined that class action settlements should only be approved when they are "fair, adequate and reasonable." *In re Catfish Antitrust Litigation,* 939 F.Supp. 493, 496(N.D.Miss.1996) (citing *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 207(5th Cir.1981), and *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir. 1982)). To make this determination, the Fifth Circuit has found:

There are six focal facets: (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely du-

ration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives and absent class members.

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir.1983).

The Court considers each criterion and facet, in turn.

## A. Existence of Fraud or Collusion

■ Although according to *Newberg on Class Actions* § 11.51 (4th ed. 2002) Courts are to "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered," this Court has made no such presumption. Rather, the Court has analyzed every aspect of the settlement in an effort to determine, independently, whether this settlement is driven by collusion, self dealing and/or attorneys' fees. There is no evidence of fraud or collusion in this case. At the fairness hearing, the Court called on objectors to substantiate allegations of collusion set forth in their written submissions. Objectors' counsel represented that they made no claim of collusion. (8/27/02 Tr. p. 248,279, 303) There has been no impropriety in reaching the Settlement Agreement facilitated by the mediation efforts of Chief Magistrate Judge John Roper. *See In re Catfish*, 939 F.Supp. at 497 (involvement of magistrate judge) *See also Holmes v. Trustmark National Bank, et al.*, Civil Action No. 1:95cv323BrR, Mem. Op. At 16 (that parties resolve differences and jointly seek court approval does not establish collusion) (citing *In re Asbestos Litigation*, 90 F.3d 963, 988 (5th Cir.1996)). Again, independent of the representations of counsel and the decision of objectors' counsel to abandon any claim of collusion, the Court has observed the conduct of class counsel vis a vis the conduct of defense counsel and has concluded that all negotiations have been at arms length and in the best interest of their respective clients insofar as such interest could be achieved within the contours of a fair, reasonable, adequate and arms length reapproachment.

## B. Complexity, Expense and Likely Duration of the Litigation

The Court found in its 1998 certification opinion that "the amended complaint comprehensively challenges the practices followed by Tower and [American Federated] in the sale, financing and administration of credit property, life and disability insurance." As indicated below, these challenges raise important threshold legal questions associated with the significance of the defendants' written disclosures and defendants' affirmative duties. Any merits resolution of the controversy would no doubt confront these issues. To the extent such issues were not resolved in defendants' favor as a matter of law, resolution of the class' broad challenges would result in complex, protracted litigation at considerable expense.

This controversy covers eight years of loans and insurance purchases and the determination of the defendants' business practices for the foreseeable future. Virtually every aspect of the business practices of Tower and American Federated is in issue. Discovery and trial would involve the depositions and testimony of numerous class members, Tower employees and American Federated employees. The parties would likely utilize State Department of Banking and Consumer Finance personnel, together with banking industry experts and consumer finance experts. Moreover, the parties would call upon State Department of Insurance personnel and insurance industry experts. Economists and accountants would be involved, and thousands of pages of documents maintained by Tower, American Federated, the Department of Banking and Consumer Finance and the Department of Insurance would likely be introduced into this action.

Continued litigation would be extremely expensive and lengthy. While considerable materials have been provided in formal and informal discovery, much additional discovery on the merits would likely be pursued. Discovery requests and production would be enormous. While the trial could proceed in stages, a comprehensive trial of all issues would unquestionably entail many weeks and at conclusion, appeals would be likely. The

burdens on the parties and the courts would be extraordinary.

## C. Probability of Plaintiffs' Success on the Merits

Notwithstanding the likely need for additional discovery required should this matter not be resolved amicably, the Court is of the opinion that sufficient evidence is in the record to enable the undersigned to come to a well founded conclusion on all issues presently before the Court including the assessment of the plaintiffs likelihood of success on the merits. In this regard the Court turns to the Fifth Circuit which has stated as follows, to wit:

> "the most important factor is the probability of the plaintiffs' success on the merits." *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.), *cert. denied,* 459 U.S. 828[, 103 S.Ct. 63, 74 L.Ed.2d 65] (1982). This view has its origin in the following argument: "If the settlement offer was grossly inadequate, as appellants contend, it can be inadequate only in light of the strength of the case presented by the plaintiffs. Naturally, they describe their offensive posture in glowing terms, sparing no superlatives, while the defendants show a similar lack of restraint in demeaning the value of plaintiffs' cause of action." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974)(quoted by *Parker, supra,* 667 F.2d at 1209). "In *Grinnell,* because the plaintiffs' case was relatively weak, they settled in order to avoid the considerable risk that they would not be able to recover at all." *Id.* at 459.

*Holmes,* Mem. Op. At 18–19.

Similarly, we find the following language: "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement ... They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.,* 450 U.S. 79, 88, n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981).

We begin by considering why the defendants would agree to settle if the defenses they offer are sound in law and fact. While it is not the business of this Court to critique the final resolution of State Court cases in certain counties in Mississippi including Jefferson and Claiborne counties which is the venue sought and chosen by a number of the objectors in this case, the undersigned sees no merit in ignoring the easily understood fear of the defense in having this class action decertified for whatever reason and having these issues resolved by a jury in one of these rural Mississippi counties where enormous verdicts are legend. In fact, the objectors point to these prodigious awards as all the more reason why this settlement is unfair. It is the argument of the objectors, that if they were allowed to proceed individually or flock together under Mississippi's liberal joinder rules, this settlement pales in comparison to what could be expected, based on well publicized State Court verdicts. While this contention is to be considered in regard to the reasonableness of the settlement, this Court also focuses on such a potential award as an explanation for the willingness of the defendants to settle at a time when they are insistent upon the viability of the defenses raised.

An evaluation of the legal claims begins with a review of the loan documentation executed by the class. Among other things, the loan disclosure statement provided the following:

### INSURANCE

Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| TYPE | DEC C.L. | C.L. | LVL. PREMIUM | SIGNATURE |
|---|---|---|---|---|
| Single Credit Life | | | $ | I/We want credit life insurance Signature: |
| Joint Credit Life | | | $ | |
| Credit Disability | | | $ | I want credit disability insurance Signature: |

You may obtain property insurance from anyone you want, provided the insurance company is acceptable to the creditor. If you get personal property insurance from or through the creditor, you will pay

| $ _____ | _____Dual Interest | _____Single Interest |

The disclosure statement further set forth the cost of credit as an annual percentage rate, the dollar amount of the finance charge, the dollar amount being financed, the total monetary amount of payments to be made, the number or payments to be made and the amount of each payment.

The insurance application and authorization form commonly executed stipulated the following:

> I hereby make application to the above named company for insurance coverage(s) for a period equivalent to the term of my loan as described in the below schedule of coverage. The option has been extended to me to purchase this insurance from any company or agent of my choice or to assign policies which I currently possess, and I freely choose the company and agent to whom this application is made.

> The beneficiary under said coverage(s) shall be the finance company, to the extent of any indebtedness I may owe at the time of a claim due under the policy(s) with the remainder payable to the second beneficiary named below, or to my estate as respects any death benefit, and to myself as respects any disability benefit.

> The finance company is authorized to deduct from the proceeds of my note which I have given to them, the amount of the premium for such insurance and pay the premium to the insuring company.

> . . . .

_____    _____
Signature of Proposed Insured Debtor    Date of Birth

Moreover, class members executed the following additional insurance disclosure form:

### DO YOU WANT TO PURCHASE OPTIONAL CREDIT INSURANCE?

Tower Loan offers credit life, and accident and health insurance in connection with its loans. Purchase of this insurance [is] not required to obtain a loan with us. We are providing you with the following informa- tion to help you decide whether you want to buy this credit insurance.

Loan amount:

Your monthly payment without optional insurance:

Life Insurance premium:

Accident and Health insurance premium:

Your monthly payment with optional insurance:

### TRUTH IN LENDING DISCLOSURE
Insurance

Credit life insurance and credit disability insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| Type | Premium | Signature |
|------|---------|-----------|
| Credit Life Insurance | | I want credit life Signature_____ |
| Credit Disability Insurance | | I want credit disability Signature_____ |

I do not want either Credit Life Insurance or Credit Disability Insurance. I acknowledge receiving a copy of this form.

### Truth –in– Lending Act Claims

The amended complaint alleges Tower failed to comply with the Federal Truth–in–Lending Act, 15 U.S.C. §§ 1601 *et seq.* and the implementing Regulation Z, 12 C.F.R. Part 226. The Class Representatives assert Tower, through deceptive disclosure statements, wrongly failed to disclose to borrowers the amount of the insurance premiums and term of the insurance. Objectors contend Tower wrongly failed to include the cost of insurance in the annual percentage rate (APR). (Pam White objectors' brief at 15).

From the Court's view of the pleadings Tower's disclosures do not appear deceptive. The insurance "blocks" on the disclosure statement are conspicuously portrayed; the kind of insurance identified; the amount of the premium is specified; the borrower is required to sign separately each request for insurance at the specified cost to him. The insurance application and authorization form

discloses the period of coverage. Tower uses the very forms suggested by Regulation Z. (Compare Reg. Z, app. H, form 10 with exh. P–2, 11/15/96 disclosure statement).

■ There is no requirement for inclusion of credit life or credit disability insurance premium costs in the APR when insurance purchase is not a condition of the loan. *See* 15 U.S.C. § 1605(b)(c), 12 C.F.R. § 226.4(a); *USLIFE Credit Corp. v. FTC*, 599 F.2d 1387 (5th Cir.1979); *Anthony v. Community Loan & Investment Corp.*, 559 F.2d 1363 (5th Cir. 1977). Further the class members are arguing in the teeth of the repeated, express disclosures, disavowing any obligation but affording them the option to purchase such insurance. Based on Fifth Circuit decisions above cited, it appears that the borrowers will have difficulty disclaiming the statements they have signed.

Similar principles apply to the noninclusion of property insurance premium costs in the APR. Under Regulation Z § 226.4(d)(2) property insurance premiums may be excluded from the finance charge if the following conditions are met: (i) the insurance coverage may be obtained from a person of the borrower's choice, and this fact is disclosed; and (ii) if the coverage is obtained through the creditor, the premium for the initial term of coverage is disclosed. Towers disclosure statement appears to satisfy both of these requisites.

### Fair Debt Collection Practices Act Claims

The class contends Tower is a debt collector under the Fair Debt Collection Practices Act (FDCPA) and Tower's collection of allegedly fraudulent insurance premiums violated the act. The merits of this claim are questionable. The FDCPA applies to independent or third-party debt collectors, not generally to the actual creditor. *See* 15 U.S.C. § 1692(a)(6); *United States v. Central Adjustment Bureau, Inc.*, 823 F.2d 880, 880–81 (5th Cir.1987); *James v. Ford Motor Credit Co.*, 842 F.Supp. 1202, 1206–07 (D.Minn. 1994), *aff'd* 47 F.3d 961 (8th Cir.1995). In a judicial setting Tower may be classified as something other than a "debt collector" under the FDCPA and in all likelihood is not

subject to it. *See James*, 842 F.Supp. at 1206–07; *but cf. Holmes*, Mem. Op. at 26 ("at least an arguable dispute whether egregious cases involving bank's collection activities would fall under the FDCPA").

### Antitrust Claims

The class alleges that defendants violated the antitrust laws of the United States as set forth in Title 15 of the United States Code. They allege that "the defendants have conspired with one another and with other finance companies to promulgate the scheme of insurance fraud and in direct restraint of trade." In this regard, the United States Supreme Court has found that:

> There is ... general agreement that § 1 [of the Sherman Act] is not violated by the internally coordinated conduct of a corporation and one of its unincorporated divisions. Although this Court has not previously addressed the question, there can be little doubt that the operations of a corporate enterprise organized into divisions might judged as the conduct of a single actor. The existence of an unincorporated division reflects no more than a firm's decision to adopt an organizational division of labor. A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself; a business enterprise establishes divisions to further its own interests in the most efficient manner. Because coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not an activity that warrants § 1 scrutiny.

*Copperweld Corp. v. Independence Tube Corp.* 467 U.S. 752, 770, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The Court likewise found that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for the purpose of § 1 of the Sherman Act." *Id.* at 771, 104 S.Ct. 2731.

■ Tower and American Federated are wholly-owned subsidiaries of a common parent corporation, First Tower Corp. As such, they do not appear to constitute "two inde-

pendent sources of economic power" sufficient to warrant Sherman Act scrutiny under the teachings of *Copperweld. See Hood v. Tenneco Texas Life Ins. Co.,* 739 F.2d 1012, 1015 (5th Cir.1984). No conduct of other finance companies in concert with Defendants appears to have been implicated here.[3]

### Fiduciary Duty Claims

The amended complaint alleges "the relationship between the parties transcended a normal lender-borrower relationship." The class contends a fiduciary relationship arose "because plaintiffs placed special trust and confidence in defendant to obtain adequate insurance for the purposes contemplated at the prevailing market rate." On this alleged premise, the class argues Tower had various affirmative duties of disclosure and obligations to purchase insurance at reasonable rates.

Courts in this district have addressed virtually identical claims. In *Strong v. First Family Financial Services, Inc.,* 202 F.Supp.2d 536 (S.D.Miss.2002), the court first observed that "the Mississippi Supreme Court has repeatedly held that lenders and their borrowers typically are not in a fiduciary relationship, and certainly are not so as a matter of law, although 'the relationship between a debtor and creditor may rise to such a level of fiduciary based on the particular facts of the case.'" *Id.* at 541. The court found:

> In the case at bar, plaintiffs allege that a fiduciary relationship arose because defendants purported to obtain insurance on plaintiffs' behalf in connection with plaintiffs' respective loans and plaintiffs thus "placed special trust and confidence in their lender" to obtain adequate insurance at a fair price. But this is nothing more than an assertion that plaintiffs trusted their lender (and by inference, its employees) because it was their lender, which is plainly insufficient under the cited authori-

ties to support finding that a fiduciary relationship existed.

*Id.* at 542. To the same effect are *Ross v. First Family Financial Services, Inc.,* 2002 WL 31059582 (N.D.Miss.); *Conner v. First Family Financial Services, Inc.,* 2002 WL 31056778 (N.D.Miss.); and *Howard v. CitiFinancial, Inc.,* 195 F.Supp.2d 811, 823 (S.D.Miss.2002) *See also Baldwin v. Laurel Ford Lincoln–Mercury, Inc.,* 32 F.Supp.2d 894, 898 (S.D.Miss.1998) (borrower cannot "assume that the resulting deal would be 'the best possible' arrangement without doing her homework").

The above district court decisions are persuasive. They appear to be applicable. Consequently, the likelihood of class success on their claims of fiduciary duty appears questionable.

### Implied Covenant of Good Faith and Fair Dealing Claims

The amended complaint alleges Tower breached an implied duty of good faith and fair dealing through deceptively providing inadequate insurance at excessive prices and charging exorbitant interest rates. The complaint alleges the class members purportedly believed that "if" Tower purchased insurance, the premiums and interest charged would be reasonable. The suggestions that Tower, after the execution of the contract, undertook to obtain insurance does not appear to square with the facts. At the time of execution of the promissory note and other contractual documents, the borrower purchased the insurance for the contractually specified premium costs and at the contractually specified interest rate. The class contests the bases on which they contracted, not Tower's subsequent performance of the contract.

Under Mississippi law, "[a]ll contracts contain an implied covenant of good faith and fair dealing in performance and

---

**3.** The Class' other federal claims are plainly insubstantial. No private right of action exists for mail fraud (count XVI) under 18 U.S.C. § 1341, See *Bell v. Health–Mor, Inc.,* 549 F.2d 342 (5th Cir.1977). The Civil Rights Act of 1964, amended as the Civil Rights Act of 1991 (count XII), involves discrimination and has no apparent re-

lationship to contentions actually being pursued here. The Class also cannot invoke the due process clause (count XII) against defendants because they are private entities. *See Shelley v. Kraemer,* 334 U.S. 1, 20, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

enforcement." *Cenac v. Murry*, 609 So.2d 1257, 1272 (Miss.1992) *See also, e.g., General Motors Acceptance Corporation v. Baymon*, 732 So.2d 262, 269 (Miss.1999) (GMAC). The covenant runs, however, with respect to the "performance and enforcement" of the contract, not to its negotiation or formation. *Howard*, 195 F.Supp.2d at 824; *Baldwin*, 32 F.Supp.2d at 899.

■ As recognized above and found in *Howard*, allegations of breach of the implied covenant based on "obtaining inadequate insurance" and making "exorbitant" charges for it "go to the formation of the contract, rather than the performance and enforcement of the contract:". *Howard*, 195 F.Supp.2d at 824. Thus, without addressing the merits of the actual charges which will be addressed further below, it appears that the prospects for class success on a claim related to the implied covenant of good faith and fair dealing are again questionable.

### Fraudulent and Deceptive Practices Claims

The class advances a variety of challenges to the lending and insurance practices of Tower and American Federated under the broad rubric of "fraudulent misrepresentation and/or omission" and "consumer fraud and deceptive business practices." The class complains Tower wrongfully forced them to purchase credit insurance. Otherwise, their challenges principally attack the amount of the premium charges, the amount of the finance charges, and the undisclosed affiliate relationship between Tower and American Federated.

■ Preliminarily, it should be noted that the allegations of fraudulent conduct are essentially predicated not on what Tower representatives allegedly affirmatively misrepresented but rather on what defendants allegedly failed to disclose. Yet, "silence, in the absence of a duty to speak, is not actionable." *Strong*, 202 F.Supp.2d at 540. *See Harrison v. Commercial Credit Corp.*, 2002 WL 548281, *2 (S.D.Miss.).

■ "One who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Chiarella v. U.S.*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348(1980) (cited and followed in *Strong*). The ·significant impediment to plaintiff establishment of a fiduciary or comparable relationship having been noted above, similar substantial barriers exist to successful claims of fraudulent omission.

To the extent affirmative disclosures may have been required, Tower and American Federated have strong arguments that such disclosures were adequately made. Furthermore, class criticism of the charges imposed appears to headlong into defendants' compliance with applicable statutes and regulations.

### Allegations of Forced Purchase of Insurance

The contention that borrowers were required to purchase insurance to obtain a loan directly contradicts defendants' numerous written disclosures specifically acknowledged in writing by the borrowers themselves. The written disclosures of Tower and American Federated repeatedly informed borrowers that credit life and credit disability insurance were optional. While property insurance was required, borrowers were advised they could obtain property insurance through the insurer of their choice; defendants' disclosures advised borrowers they were not required to purchase insurance through Tower or American Federated.

■ The threshold question is whether the class members may withdraw from the contracts they signed. Mississippi law generally does not permit a contracting party to assert oral misrepresentations to avoid the plain provisions of the written contract. *E.g., Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., Inc.*, 584 So.2d 1254, 1257 (Miss.1991)

On at least two instances, courts in this district have addressed borrower allegations of being required to purchase insurance even though contractual documents stated just the opposite. *See Strong*, 202 F.Supp.2d at 543–

44; *Howard,* 195 F.Supp.2d at 820–21. The court in *Strong,* in rejecting borrower allegations of required insurance purchase and upholding the sufficiency of the written disclosures, stated:

> "[A] person is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract," *Godfrey, Bassett v. Huntington Lumber and Supply Co.,* 584 So.2d 1254, 1257 (Miss.1991), regardless of whether or not he actually read the document. *See Cherry v. Anthony Gibbs, Sage,* 501 So.2d 416, 419 (Miss.1987) (stating that "knowledge of [the contents of a contract] [will] be imputed to [a party] as a matter of law" even though she did not read the contract before signing it) citing *Atlas Roofing Mfg. Co., Inc., v. Robinson and Julienne, Inc.,* 279 So.2d 625, 629 (Miss. 1973); *see also Warrington v. Dawson,* 798 F.2d 1533, 1544 n. 10 (5th Cir.1986) ("The 'generally prevailing law' is that 'one is presumed to have read a contract that one signs.' "). The fact that the loan and insurance documents executed by plaintiffs conspicuously and clearly disclose that credit insurance was not required as a condition for plaintiffs' loans precludes any reasonable possibility of recovery by plaintiffs on their claims against the resident defendants based on allegations that defendants failed to disclose that credit insurance was not required or that they misrepresented that such insurance was required as a condition to obtaining their loan. *Cf. Carter v. Union Security* (holding that plaintiff's alleged reliance on agent's alleged representation that credit insurance was necessary was, as a matter of law, not reasonable since the uncontroverted evidence demonstrated that the terms of the contract were made available to and read by the insured.)

202 F.Supp.2d at 543–44. The court's treatment in *Howard* of such issues is essentially the same. *See Howard,* 195 F.Supp.2d at 820–22, 825. Similar circumstances here argue that this Court should do likewise.

### Alleged Excessive Insurance Premiums

*Miss.Code Ann.* § 83–53–23 establishes the premiums that may be charged for credit life and credit disability insurance. The statute deems rates consistent with the statutory structure to be reasonable. Defendants set the subject rates and charged premiums in accordance with this regulatory environment in which they operated. (Parker, 8/27/02 Tr. p. 86–87; Parham, 8/27/02 Tr. p. 182–87; exh. D–5)

The regulations promulgated by the Mississippi Department of Banking and Consumer Finance concerning small loan companies sanction charges to borrowers for property insurance premiums. They also delineate other terms governing the provision of property insurance. (Exh. D–49, D–50, D–51) Tower's practices appear to have been consistent with these regulations. (Parker, 8/27/02 Tr. p. 87; Parham, 8/27/02 Tr. p. 182–87; exh. D–5)

In addition to the rates, the Class complains Tower sells the property insurance based on inflated values of the loan collateral. This issue, too, is covered by state regulation. The borrowers affirmatively represent the value of the personal property to Tower in their promissory notes and security agreements. (Exh. P–2, P–3) The state regulations stipulate "the licensee may rely on borrower's representation of the value of the personal property." (Exh. D–49, § 4(a); exh. D–50, § 7(a); exh. D–51, § 4(a))

"Under the filed rate doctrine, any 'filed rate'—that is, a rate approved by the governing regulatory agency—is 'per se reasonable and unassailable in judicial proceedings brought by rate payers.' " *American Bankers' Ins. Co. of Florida v. Wells,* 819 So.2d 1196, 1203–04 (Miss.2001) (citation omitted). Thus, borrower allegations of excessive rates, or challenges of the "rates and terms" of the governmentally-approved insurance contracts, are barred by the filed rate doctrine. *Id.* at 1205. *See Strong,* 202 F.Supp.2d at 545 (following *American Bankers'* and rejecting claims of "inadequate" and "grossly overpriced" insurance).

Tower is required to conduct its business pursuant to applicable statutes and regula-

tions and, accordingly, should be protected by law when it complies with these statutes and regulations. *See, e.g., Cappaert v. Bierman,* 339 So.2d 1355, 1357 (Miss.1976); *Deposit Guaranty Bank & Trust Company v. Williams,* 193 Miss. 432, 9 So.2d 638, 639–40 (1942). Such protection appears appropriate here.

### Alleged Excessive Finance Charges.

■ That the finance charges imposed by Tower as a small loan company may appear high when compared to rates traditionally charged by banks does not make them excessive or unlawful. *Miss.Code Ann.* § 75–17–21 sets forth the allowable finance charges and closing fees. Tower's charges and fees appear to fall within the statutorily-approved rates. (Parker, 8/27/02 Tr. p. 85–86)

### The Undisclosed Affiliate Relationship Between Tower and American Federated.

Tower and American Federated are both wholly-owned subsidiaries of First Tower Corp. On this basis, the Class characterizes American Federated as a "captive insurer." The Class complains about American Federated payment of commissions to Tower employees, describing them as "kickbacks." The Class maintains the undisclosed, "secret" relationship between Tower and American Federated constitutes an unlawful deceptive practice.

Yet, purchase of insurance from an entity affiliated with the lender does not appear to be prohibited by law. Clearly, insurer payment of commissions on credit life and disability insurance is statutorily sanctioned. *See Miss.Code Ann.* § 83–53–25. The argument that the receipt of commissions encourages the marketing of insurance has little probative value.

Tower disclosed the insurance coverage and the premium rates, both of which complied with state laws and regulations. Such disclosures, rather than explanation of commission payment practices, would appear to be all that is required. *See Baldwin,* 32 F.Supp.2d at 899–900 (borrower furnished with terms of bargain free to accept or reject but not permitted to challenge commission

relationship between entities). Further, even if there were an arguable duty of affirmative disclosure of the affiliate relationship, nondisclosure does not appear to have caused any injury. *See GMAC,* 732 So.2d at 270 (no fraud associated with failure to disclose parent-subsidiary relationship between lender and insurer where, among other things, no injury resulted).

### Negligence Claims

■ The Class recasts much of the conduct alleged to be fraudulent or deceptive in allegations of negligence. (Exh. D–1, counts IV & VIII) To the extent the Class alleges negligent failures to disclose, the question is essentially the same as addressed in the context of alleged fiduciary duties and fraudulent omissions. "[T]he failure to act where there is no duty to act is not negligence." *Howard,* 195 F.Supp.2d at 825. Thus, it is questionable as to whether the plaintiffs could be successful in their negligence claims associated with the defendants' failure to act affirmatively through greater disclosures or securement of allegedly better or more favorably priced insurance.

It is also not necessary to address again issues of excess insurance premium and finance charges. The negligence allegations also include, however, challenges to insurance premium refund practices associated with use of the Rule of 78ths. (Exh. D–1, ¶ 85) Yet, as with setting the premium rates themselves, refund practices, too, are dictated by statute.

The Rule of 78ths is also known as the "sum of the digits" method. *See Miss.Code Ann.* § 75–67–127(1)(c). *Miss.Code Ann.* § 83–53–17(2) requires the use of the " 'sum of the digits' formula" on refunds for decreasing term credit life insurance and all credit disability insurance. The small loan company regulations require refunds of unearned premiums for property insurance to be "calculated under the Rule of 78ths, unless the policy calls for a greater refund amount." (Exh. D–49, § 4(e)) Only level term credit life insurance is to be refunded "pro rata." *See Miss.Code Ann.* § 83–53–17(2). The record suggests Tower and American Federated have complied with the

statutory and regulatory requisites. (Parker, 8/27/02 Tr. p. 87–88; Parham, 8/27/02 Tr. p. 182–87)

## Flipping Claims

Count XVII of the amended complaint (Exh. D–1) "charges that the Defendants have been guilty of 'flipping.'" The Class thereby challenges Tower's practice of allowing customers to renew existing loans when borrowing additional funds or extending the terms of repayment. There does not appear to be any rule of Mississippi law prohibiting such renewals. So long as Tower properly refunds unearned finance charges and insurance premiums, Tower does not appear to be precluded from allowing borrowers opportunities to refinance their existing loans.

The Class apparently charges that Tower's "flipping" of loans unlawfully increases the costs of borrowing. Yet, complaints that Tower improperly profits through unfair finance charge and insurance refund practices appear unavailing, inasmuch as refund methods are mandated by law. Further, Mississippi's finance charge statute (§ 75-17-21) contains a tiered structure permitting higher annual percentage rates for smaller loans than larger loans. *Miss. Code Ann.* § 75-17-29 prohibits lenders from making multiple loans with the intent to obtain higher finance charges. If lenders were not prohibited from making multiple loans, and if borrowers were not allowed to renew or consolidate their loans, small loan companies could manipulate the tiered structure of § 75-17-21. Plaintiffs' allegations of "flipping" appear to conflict with legislative provisions designed for their protection. (Parker, 8/27/02 Tr. p. 88–89)

## Regulatory Claims.

The Class alleges Tower has violated the Mississippi small loan regulatory law and related regulations of the Department of Banking and Consumer Finance. (Exh. D–1, count XIV) Allegations concerning excessive charges, refunds, false disclosure statements and solicitation practices have been specifically addressed previously. (P. 31, 37–42,

43–44, *supra*) The other allegations do not appear to be supported by the record and otherwise appear largely inconsequential. (Parker, 8/27/02 Tr. p. 84–89; Parham, 8/27/02 Tr. p. 182–87)

## Summary of Claims

While not every allegation in the lengthy amended complaint has been discussed, the Court has addressed the essence of the claims. The Court has considered those claims which the submissions of class counsel, defendants and objectors indicate should be evaluated in an assessment of the settlement. The Court emphasizes that it has not, in this appraisement, resolved the merits of any claim nor is it this Court's mission to do so at this stage of the proceedings. The inquiry here is to critique the probability of the plaintiffs' success on the merits, mandated by the six facets of determination espoused by the Fifth Circuit. (See *Reed v. General Motors Corp., Supra*) Thus, with a view toward being open minded in the event this matter is resubmitted to this Court for further determination but within the required parameter of assessing the viability of claims asserted by the plaintiff, it is very apparent to this Court that the class would face significant barriers in pursuit of a favorable judgment on the merits.[4] In fact, at one time in these voluminous proceedings the Court recalls asking counsel to explain with brevity and clarity how the defendants, in their lending practices, deviated from statutory law. The Court has not researched the record to revisit the exact question or answer, but the Court's impression of the case then, as now, is such that we return to the issue of why are the defendants willing to compromise. In part the answer, no doubt, lies in the observation appearing on page 354 above.

## Range of Possible Recovery

One method of assessing the possible range of recovery is to juxtapose the relief sought in the complaint realistically against that provided by the settlement. To some

---

4. These barriers obviously *suggest significant* problems with the "Class" claim for punitive damages. The issue of punitive damages is ad-

dressed further below in the context of range of relief available to the Class. (P. 363–65, *infra*)

extent it is within this context that the Court considers this fifth facet mandated by the Fifth Circuit in *Reed*. Should this case go to trial, the range of possible recovery, by any fair minded estimate, would not rise to the level of equitable relief granted to the class by the Settlement.

## Equitable Relief

The Class maintains they have no adequate remedy at law. Therefore, they seek injunctive relief enjoining the Defendants from engaging in the challenged practices associated with the making of loans and procurement of insurance for Class Members and future borrowers. Among other things, the Class specifically requests "a court order requiring the Defendants to terminate all 'packing' of credit life, credit disability and property insurance unless and until the proposed plan is submitted to and approved by the court." (Exh. D–1, ¶ 116(h))

The Class' claims focus on allegedly deceptive, coercive and inadequate disclosures concerning the provision of insurance. Much of the claims revolves around alleged defendant failures to affirmatively assure the Class Members are told all material aspects of the loans and insurance transactions. The Class seeks to eliminate allegedly deceptive marketing practices and insurance "packing" through judicial delineation of comprehensive business practices. They ask the Court to delineate practices which assure the borrower's choice of insurance is truly real and the borrower understands as much as possible about the implications of the financial transaction in which he or she is participating.

To accomplish these objectives, Class Counsel has negotiated substantial equitable relief which exceeds any relief this Court would in all likelihood award. The injunctive relief goes far beyond judicially mandated use of a single prescribed disclosure statement and insurance application and authorization form.

For example, the Settlement Agreement requires delivery to the borrower of a comprehensive separate written statement entitled **"LOAN AND INSURANCE INFORMATION."** (Exh. D–47, Exh. A) This statement emphasizes the significance of borrowing money, describes the fundamental components of the loan transaction and relates all material aspects of available insurance alternatives. The insurance information description begins with the following reminder, again in bold-faced, all capital letters:

**YOU DO NOT HAVE TO BUY CREDIT LIFE INSURANCE OR CREDIT ACCIDENT AND HEALTH INSURANCE TO GET A LOAN FROM US. IF YOU WANT INSURANCE, YOU HAVE THE RIGHT TO CHOOSE ANY INSURANCE AGENT OR COMPANY QUALIFIED TO DO BUSINESS IN MISSISSIPPI.**

(Exh. D–47, exh. A, p. 4)

Multiple other separate disclosures address the optional nature of credit life and disability insurance and borrowers' rights not to buy property insurance through Tower. (Exh. D–47, Exh. B, C, E) A sign is to be conspicuously posted in the lobby of every Tower office declaring borrower rights concerning insurance. (Exh. D–47, Exh. E) Separate disclosures addressing alternative loan maturities and the associated monthly payments are to be provided. (Exh. D–47, Exh. F) Maximum allowable values on loan collateral for personal property insurance are to be established and disclosed to the borrower. (Exh. D–47, Exh. H) A borrower certification that the loan collateral is not already insured and the represented values are correct is to be utilized. (Exh. D–47, Exh. I)

Numerous other remedial measures involving loan documentation preparation, the provision of insurance, loan renewal practices, premium refunds, and improved loan collateral policies are among the equitable relief provisions. As described by the former Commissioner of the Department of Banking and Finance, the injunctive relief provisions in the Settlement Agreement constitute "a model for better business practices for the entire [small loan company] industry." (Parham, 8/27/02 Tr. p. 196) Indeed, the former Commissioner insisted the Settlement Agreement "obligated Tower ... to go above and beyond what is actually required by present Mississippi law." (Parham, 8/27/02 Tr. p.

190; see Parker, 8/27/02 Tr. p. 102) Such an assertion is not without merit.

The Class urges the Court to direct such equitable relief not only for their own benefit but also for the benefit of future borrowers. Small loan companies render an important service to Mississippi citizens. (Parham, 8/27/02 Tr. p. 187) They afford credit opportunities to consumers generally characterized by low income and marginal credit records. Commercial banks do not generally serve such clientele. Apart from small loan companies, these persons are largely left with lenders of last resort such as check cashers, car title lenders and pawn shops whose charges are traditionally much higher than those of small loan companies. (Parham, 8/27/02 Tr. p. 187–89)

Settlement evaluation includes assessment of the benefit to the existing Class of the prospective equitable relief. The benefits here, while in many respects immeasurable, are significant. The vast majority of the Class are, or will be, repeat borrowers. Approximately 60% of the Class are already repeat borrowers. (Exh. D–47, p. 30, n. 3–4) Over 75% of Tower borrowers are estimated to borrow within four years of their initial loan and approximately 80% will reborrow within eight years. (Exh. D–37, ¶ 7) The equitable remedies here will be constant reminders to the Class of the terms and implications of the debtor-creditor relationships into which they are entering.

### Compensatory Damages

The Class predicates their claim for compensatory damages on the amount of insurance premiums and associated charges paid. The amended complaint includes counts seeking restitution, demanding disgorgement and claiming unjust enrichment of Defendants. (Exh. D–1, counts X, XI; prayer for relief) The Class specifically requests "a court order requiring Defendants to refund to plaintiff and all Class Members all premiums and related charges made to Defendants or its agents." (Exh. D–1, ¶ 116(d)) Thus, the compensatory damages here are themselves in the nature of an equitable remedy. (9/9/98 class certification opinion, exh. D–20, p. 19–20)

The Settlement Agreement provides for over $2.2 million in compensatory damages, not an inconsiderable sum. Further, this amount is less than one-third of Defendants' out-of-pocket monetary obligations under the Settlement. Also, this $2.2 million does not take into account the substantial amounts of undisputed lawful loan charges which Tower will forego under the equitable relief which restructures its future operations. (Exh. D–47, p. 13–28) The apparent strength of Defendants' defenses based on the disclosure statements and insurance authorization forms notwithstanding, Tower and American Federated have agreed to make a multimillion dollar payment in settlement without first testing these defenses.

The Class' TILA claims seek to recover damages for alleged disclosure failures related to insurance costs and terms. Any actual damages would appear to be no different than the state law demands for insurance premium refunds. Statutory damages under TILA are capped in class actions at the lesser of $500,000 or one percent of the creditor-defendant's net worth. See 15 U.S.C. § 1640(a)(2)(B). Defendants' consolidated net worth being greater than $50,000,000, the $500,000 cap applies. The compensatory payment under the Settlement obviously exceeds that amount.

At the same time, however, the $2.2 million amount is less than 10% of the net premium paid by the Class over the relevant period. (Exh. D–56) It also results in individual payments to Class Members of less than $30. Were the Class to prevail on their state law claims, the total monetary payout and individual payments would likely be several multiples of these amounts. Even so, it does not follow that these amounts are unreasonably low in the big picture of this settlement resolution. Reasonableness is not to be evaluated in isolation. Other monetary payments are to be made, and there is an overburden of substantial equitable relief which is not dependent on monetary payments.

### Punitive Damages

The Settlement Agreement provides for the payment of approximately $4.4 million in punitive damages. While payments are

structured for distribution to individual Class Members with repeat borrowers to receive a larger share, the Court's principal concern is the total amount. The Court evaluates the $4.4 million largely in the context of the reprehensibility of the Defendants' alleged conduct and Defendants' net worth.

The Fifth Circuit has capsulized the purpose of punitive damages in Mississippi this way:

> Punitive damages punish. The almost unanimous rule is that "[p]unitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct." *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–67, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981).

Mississippi's controlling law on punitive damages follows the majority rule. According to the Mississippi Supreme Court, a reasonable instruction on the state's law of punitive damages is as follows:

> Punitive damages are added damages awarded for public service in bringing a wrongdoer to account, as an example to warn and deter others from repeating the same act. They are never awarded to benefit the injured party or as a matter of right, but rather to punish and to compel the wrongdoer to have due and proper regard for the rights of the public.

*McGowan v. Estate of Wright,* 524 So.2d 308, 310 (Miss.1988); *see also Wesson v. United States,* 48 F.3d 894, 899–900 (5th Cir.1995) (examining nature of punitive damages under Mississippi law). Mississippi's legislature recently codified this view of the law, fully effective as of July 1, 1994. See *Miss.Code Ann.* § 11–1–65 (Supp.1994).

*Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1332–33 (5th Cir.1995).

In assessing as to whether this case represents issues which, if allowed to be considered by a jury, would rise to a level which would justify an award of punitive damages, we are mindful of the position of the objectors which is that juries in specified counties of Mississippi have been most charitable in their awards made to exact punishment upon various defendants. And in our overall assessment of the range of possible recovery by the plaintiffs, these awards are relevant although conjectural. We are dealing in this case with a highly regulated industry. The Legislature has statutorily established the interest rates under attack, and the Legislature has statutorily authorized the sale of credit life, disability and property insurance. The Legislature has statutorily dictated the premiums to be paid, the commissions which may be received and the refund practices for credit life and disability insurance. The State Department of Banking and Consumer Finance and the State Department of Insurance oversee and regulate virtually every aspect of this industry.

Consequently, the allegations of class members, as visceral as they may sound, begin to diminish under scrutiny. Defendants in these kinds of cases should not be liable for punitive damages for conduct consistent with state statutes and regulations. *See Tew v. Dixieland Finance, Inc.,* 527 So.2d 665, 673 (Miss.1988) (licensee not liable for actions taken in good faith reliance on Regulations of Department of Banking and Consumer Finance); *Frazier v. State ex rel. Pittman,* 504 So.2d 675, 704 (Miss.1987) (no bad faith when party acts in reliance on statute); *Miss.Code Ann.* §§ 75–67–137, 75–67–245; Regulations, State Department of Banking and Consumer Finance (Exh. D–49, § 20; Exh. D–51, § 13).

This is not to discount the arguments made by the plaintiffs which claim that the loan and insurance disclosures are inadequate; and that the marketing practices are impermissible; this is only to say that there seems to be substantial support for the Defendants' position that the Class as well as the objectors seek to pounce upon the unpopularity of an industry which imposes legally permissible high rates with a view towards success notwithstanding the lawfulness of the Defendants' activities. Should the class members in this case be put to their proof punitive damages are far from a given.

On the other hand, however, punitive damages here are considered in light of Defendants' net worth. The net worth of First Tower Corp. as of December 31, 2001 was $68,913,892. (Richards, 8/27/02 Tr. p. 215–16) First Tower Corp. is the parent corporation of Tower and American Federated. The approximately $69 million constitutes the consolidated net worth of the various loan and insurance entities. Thus, the $4.4 million in proposed punitive damages represents about 6.5% of Defendants' net worth.

In *Mutual Life Ins. Co. of New York v. Wesson*, 517 So.2d 521, 530–33 (Miss.1987), the Mississippi Supreme Court addressed the amount of a punitive damages award where, unlike here, the evidence was "overwhelming" that MONY had no arguable, legitimate or justifiable reason for its conduct and was grossly negligent. *Id.* at 528. MONY's assets were over $8 billion and its net worth was some $445 million. The Court reduced an $8,000,000 punitive damages award to $1,500,000 (.33487% of MONY's net worth).[5] The Settlement amount here of $4.4 million (6.5% of net worth) in an action largely involving compliance with governmental guidelines and not involving terrible personal injuries, is well within any arguable zone of reasonableness.[6]

### Opinions of Persons Involved

A number of persons have objected to the proposed Settlement. (P. 17–20, *supra*) Although the Court does not discount the substance of these objections proportionately to their exceedingly small number, the Court does recognize that the objectors comprise only approximately 1.2% of the Class. Even so, as said, a proper evaluation of the Settle-ment must be made and is herein made to insure the protection all Class Members, including objectors. Consideration of who made the objections is also appropriate.

The objectors essentially assert three objections to the Settlement. First, they oppose the mandatory class aspects of the Settlement and many have moved for leave to "opt out" of the Class. Second, objectors contend the injunctive relief under the Settlement is meaningless. Third, they maintain the monetary payments under the Settlement, both as to compensatory and punitive damages, are inadequate.[7]

The appropriateness of mandatory participation will be subsequently addressed in the context of further consideration of class certification as contrasted with. the reasonableness of the Settlement. (P.70 *et seq., infra*) The lack of merit in the objectors' challenges to the equitable relief and monetary payments under the Settlement is explained below.

### Equitable Relief

Objectors contend the injunctive relief under the Settlement Agreement is not substantial. (Docket No. 151, p. 2; Docket No. 154, p. 3) They contend that because the relief "merely forces" Tower and American Federated to "follow the law," it is, therefore, a "farce." The Court views this matter differently. The Plaintiffs maintain that the Defendants have failed to abide by the legal requirements for this highly regulated industry, which allegations the Defendants deny. The injunctive relief granted by the settlement removes any lack of clarity and establishes firm rules which the Defendants must

---

5. The court in *MONY* took the opportunity to point to cases in Texas and California where "the awards were for terrible personal injuries sustained by the victims." 517 So.2d at 533. In the California case, *Grimshaw v. Ford Motor Co.*, 174 Cal.Rptr. 348, 119 Cal.App.3d 757 (1981), the punitive award of $3.5 million was approximately .005% of Ford's net worth. "Ford's tortious [reprehensible] conduct endangered the lives of thousands of Pinto purchasers." 119 Cal.App.3d at 819, 174 Cal.Rptr. 348.

6. Recent action of the Mississippi Legislature reinforces observations of favorable treatment of the Class here. While not controlling in this action commenced before passage of the legisla-tion, the Legislature has imposed a cap on punitive damages exposure for companies the size of First Tower Corp. of $5,000,000. See House Bill No. 19, Civil Justice Reform, § 6; December 3, 2002.

7. Objectors' submissions also contest the mode, content and general adequacy of the Notice of Settlement provided the Class. The challenges appear, however, largely perfunctory, and notice issues have already been adequately addressed. (P. 12–16; P. 22–24, *supra*) Several objectors do raise circumstances peculiar to them which will be addressed in due course.

follow in the future; moreover the injunctive relief appears to go far beyond the February 10, 1992, Federal Trade Commission decision and order which has been referenced by the objectors.

Moreover, it is noteworthy that the objectors have, themselves, specifically asked five different state courts to craft a court-ordered plan establishing future procedures for insurance placement. (Exh. D–3(a) thru D–3(k), count XII) Further, identical demands were made in the *Bryant Jones* complaint. (Exh. D–41, count XIV) Having independently investigated the various settlement documents in the *Bryant Jones* case, the undersigned recalls that a significant part of the settlement involved future court-ordered loan insurance practices for Defendants. (Parker, 8/27/02 Tr. p. 73)

Thus, Judicial clarification and delineation of lawful business practices are both desirable and necessary in this proceeding and are sought by the Class. The judicial mandate of comprehensive practices to better inform borrowers is meaningful. Not only does the Court deem these future standards of conduct to be of importance, but the class representatives have argued ad nauseam that because most of them are repeat customers, these requirements of the lender constitute the gravamen of the relief which they have sought from the beginning.

### Monetary Payments

Objectors contend that the combined payments for compensatory and punitive damages of less than $100 per Class Member are unreasonably low. In support of this assertion, however, they have failed to adequately address the legal merits of the borrower's claims. Again, in support of their position of inadequacy, they remind the court of other verdicts which have been referenced heretofore in this opinion.

Mindful of their claim that the Settlement "dramatically undervalues the absent Class Members' claims," (Docket No. 152, ¶ 4) the Court awaited testimony and other evidence at the various hearings to assist the Court in evaluating every aspect of this case. Although there was testimony from counsel, no objector testified. Other than as mentioned hereinbefore, there were no witnesses called at the fairness hearings. There were only a small number of affidavits submitted. These affidavits appear to afford no basis for the Court to criticize the written disclosures made by the Defendants. There is no case made by the objectors which suggest an arguable basis for compensatory monetary payments greater than the insurance premiums and charges associated with the loan.[8] Objectors' counsel contend the compensatory claims are very small, speculating (with some hyperbole) they "range from ... maybe a couple of hundred dollars to maybe several thousands of dollars." (8/27/02 Tr. p. 286)

Objectors assert the same claims as the Class. (P. 1–4, *supra*) Without citation of legal authority, objectors emphasize two purported causes of action for the conduct of which they complain. First, they argue Defendants' practices are in "violation of the duty of good faith and fair dealing." (8/27/02 Tr. p. 298) Like the Class' claims, however, the conduct of which objectors complain occurred at the time of entering the contractual relationship. No such implied duty or covenant existed at that time. (P.36, 37)

Otherwise, objectors argue Defendants' practices constitute "fraud; just plain ole common-law fraud." (8/27/02 Tr. p. 298) Objectors never offered any evidence, however, distinguishing their claim from the various fraudulent practices claims of the Class. Nothing specified about the objectors' claims suggests they are of any greater value than those of the Class. (See discussion of merits of Class claims, 27–45, *supra*)

Although this Court has sought a benchmark from which the viability of the claims against Tower could be compared and judged, the suggestion by the objectors that legitimate comparisons could be made to other trials in specified venues is flawed for the reason that this Court could not be expected

---

**8.** The affidavit of Mary Agee does state she "attempted to file a claim on [her] disability insurance coverage" and "said claim was denied." (Exh. P–1(a), 9/20/01 hearing) Alleged wrongful denial of claimed insurance benefits is not, however, a subject of this class action proceeding. (See P. 61,62, *infra*)

to independently investigate every state court action mentioned by affidavit or in other submissions by counsel for the objecting parties. The undersigned is aware from the objectors' presentations that a "full jury trial" in an action in Circuit Court in Holmes County, Mississippi was fruitful from the standpoint of the plaintiff. But a generic reference to other cases involving finance companies and financial issues without more specificity from which comparisons can be made, has little probative value. As an example, the purported awards of punitive damages of $3 million each to 23 plaintiffs for a total of $69 million has little influence upon this Court without a more definitive comparison of the issues. What was the net worth of the defendant? What are the facts? It could be argued that references to such awards are far more supportive of the fairness of the Settlement, and the Rule 23(b)(1)(A) certification than they are for the proposition that the Settlement is unfair and unreasonable.

## Scope of the Release

Objector Christine Brooks seeks to be excluded from the Settlement and to opt out of the Class because she maintains she has a claim for bad faith failure to pay insurance benefits. (8/27/02 Tr. p. 271–76) Objectors' counsel for the Pam White group argued Class Members are wrongly being required to release claims of wrongful repossession and wrongful foreclosure. (8/27/02 Tr. p. 252) These objections raise issues concerning the scope of the release of claims in light of the class certification.

The class certified is defined to include persons who paid premiums to American Federated for insurance associated with loans made by Tower. Ms. Brooks and the Pam White group are members of the Class. The amended complaint, however, does not plead claims for alleged bad faith denial of insurance benefits. Nor does it allege claims for wrongful repossession or foreclosure on loan collateral. The state court actions of Brooks and the Pam White group, however, have been properly enjoined because they contain direct challenges of the sale and costs of credit insurance.

While her contentions do not warrant her exclusion from the Class, the assertions of Brooks do justify scrutiny of the scope of the release contained in the Settlement Agreement. The release language (exh. D–47, p. 36–37) is understandably broad. It may, however, be too broad. The release properly addresses claims in any way related to the allegations of the complaint and also includes claims that "relate in any way to the Tower Loan Companies' loan/insurance practices." Clarification appears clearly warranted, however, to assure that any claims against American Federated for wrongful failure to pay insurance benefits are not barred for being "related to the Tower Loan Companies' loan/insurance practices."

Release modification is not warranted for wrongful repossession or foreclosure claims. No objector with any such claim has been specifically identified. Presumably, the claims postulated by counsel are for allegedly unlawful collection practices and do not challenge the lawfulness of credit insurance placement or charges. Consequently, they would not relate to the allegations of the complaint. Release clarification is not necessary, for such claims would not be barred by the release as presently drafted.

## Special Payments and Attorney's Fees

Given the somewhat atypical procedural history of this controversy, the Settlement Agreement provides for special payments to Class Members other than the present Class Representatives Claudia Smith Love and Wilbert Walker. (Exh. D–47, p. 30–31) The Agreement also permits, but does not require, the Court to allocate a portion of the attorneys' fees award to counsel other than present Class Counsel. (Exh. D–47, p. 29)

## Special Payments

■ The Settlement Agreement directs special payments to Class Members who have acted in one of three capacities: (i) Class Representatives in this action; (ii) Class Representative in the *Bryant Jones* action; or (iii) plaintiff in an individual action stayed by court order in the *Bryant Jones* action. Class Representatives in this action or *Bryant Jones* are to receive $2,500 each. The plaintiffs in individual actions are to

receive $1,000 each. The total dollar amount set aside for these payments is $45,500. (Exh. D–47, p. 30–31)

▪ Courts commonly permit payments to class representatives above those received in settlement by class members generally. Such payments, however, must be reasonable in light of applicable circumstances, and not "unfair" to other class members. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir.1999) (approval of incentive payment to class representative); *In re Catfish*, 939 F.Supp. at 503–04 (not unusual to make incentive awards to class representatives).

Bryant Jones commenced the original action against Tower and American Federated, and the Class Representative in that case initiated discovery as well as the initial framework for settlement purposes. Other plaintiffs who pursued state court actions also contributed to the settlement. Consequently, recognition of these persons in the Settlement Agreement in this case is appropriate.

The amounts of the special payments to the Class Representatives and state court plaintiffs are reasonable. There is no unfair disparate treatment of other Class Members. Payment of these special payments under the Settlement Agreement will have no significant effect on the individual amounts distributable to other Class Members.

## Attorneys' Fees

When final according to its terms, the Settlement Agreement obligates Defendants to deposit at least $6.6 million for distribution to Class Members. (Exh. D–47, p. 29–30 n. 2–4) The Settlement Agreement further provides for creation by Defendants at that time of an Attorneys' Fee Fund of $900,000 for payment of such attorneys' fees up to that amount as may be directed by the Court. (Exh. D–47, p. 31–32) This obligation of De-

fendants is over and above the $6.6 million class distribution. The Settlement Agreement affords the Court the discretion to establish the amount of attorneys' fees, not to exceed $900,000 in the aggregate, and to allocate the fees among present Class Counsel and others whose efforts are determined to have made a material contribution to the Settlement. (Exh. D–47, p. 29)

▪ The efforts of Class Counsel, and other counsel, have resulted in provision for a common fund of $6.6 million.[9] The authority of a court to award attorneys' fees based on the common fund created in class action litigation is well established. The determination of a reasonable amount is generally made under "the 'lodestar' approach (hours expended × hourly rate) or as a 'percentage of benefit,'" or to some extent both. *Holmes*, Mem. Op. at 44; 4 *Newberg on Class Actions* §§ 14:5–14:7. Because the percentage of benefit methodology readily produces a reasonable result in this complex action, it shall be followed. *See, e.g., In re Catfish*, 939 F.Supp. at 499–501.

▪ "No general rule can be articulated on what is a reasonable percentage of a common fund." 4 *Newberg on Class Actions* § 14:16, p. 550. The $900,000 amount here is approximately 14% of the $6.6 million common fund. Such a percentage appears to fall very much on the lower end of judicially approved percentage awards. *See In re Catfish*, 939 F.Supp. at 501 (use of 25% as "benchmark percentage"; noting awards commonly fall between 20% and 30%); 4 *Newberg on Class Actions* § 14:6, p. 550–51 (upper end of 50%; securities and antitrust litigation 20% to 33⅓%; "mega-fund settlements" more than 15%; multiple instances of 33⅓% awards).[10] Moreover, the $900,000 is not to be paid out of the common fund as is more often the case. Determining the percentage based on Defendants' total monetary

---

9. Their efforts also resulted in the substantial injunctive relief which is of considerable value.

10. The reference here to 14% of the common fund affords no consideration to the benefits of the injunctive relief. When ascertaining the benefit of a settlement to the class, a court may consider benefits which are not directly pecuniary in nature. *See Hall v. Cole*, 412 U.S. 1, 7 n.

7, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) (benefit associated with relief "which corrects or prevents an abuse which would be prejudicial to the rights and interests of others"). The substantial benefit associated with the injunctive relief, although unquantifiable, further corroborates the reasonableness of the attorneys' fees percentage of the common fund.

obligation of approximately $7.5 million reduces the percentage constituting attorneys' fees to approximately 12%. Clearly, a total attorneys' fee award of $900,000 is reasonable in light of the efforts expended and results obtained by counsel.

As indicated above, these proceedings were initiated by the Class Representative in the *Bryant Jones* action, referenced throughout this opinion. Some of the state court plaintiffs were materially involved in *Bryant Jones*. For reasons similar to those justifying special payments to the *Bryant Jones* class representatives as well as to certain state court plaintiffs, the Court has previously indicated that it will consider the issue of whether an allocation of a portion of the $900,000 Attorneys' Fee Fund to their counsel is appropriate. *See Forbush v. J.C. Penney Co.*, 98 F.3d 817, 819, 825 (5th Cir.1996) (allocation of total attorneys' fee award to others than lead class counsel); *Longden v. Sunderman*, 979 F.2d 1095, 1098, 1101, 1104 (5th Cir.1992) (affirming allocation of portion of class counsel's fee to counsel who initiated litigation on nonclass basis as "district court was in a unique position to observe ... case from start to finish, and it could properly include observation of the performance by all counsel, including Class Counsel").

The Court has received no submission from *Bryant Jones* class counsel or other counsel regarding their desire to make application for a portion of the Attorneys' Fee Fund, but continuing with the precedent that has been established in this Court for allowing all parties to be fully heard, a percentage of the fund will be set aside in the Final Judgment which follows in such amount as the Court deems proper at that time, with the major part of the fund being allocated to class counsel in this case. The setting aside of this fund will not affect the Final Judgment in this case, nor is it to be taken as an indication as to what the Court will do in the end. This process should be viewed as it is intended, which is an opportunity for all sides to be heard on this issue at the appropriate time. Any counsel who wishes to apply for a portion of these funds must do so within thirty days from the entry of the Final Judgment in this case.

### Overall Assessment of Settlement

The foregoing consideration of the commonly applied settlement evaluation factors, individually and collectively, weighs in favor of Settlement approval. Again, "the most important consideration [in evaluation of settlement fairness, reasonableness, and adequacy] is 'the strength of the case for plaintiffs on the merits, balanced against amounts offered in settlement.'" *Petrovic*, 200 F.3d at 1150 (citations omitted). (P. 27, *supra*) "'It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair.'" *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 459 (9th Cir.2000) (citation omitted).

Here, there are significant questions associated with the merits of the Class' claims. Plaintiffs' success depends to a significant extent on their ability to overcome what appear to be written disclosures and other requirements with which Defendants maintain they were in full compliance. Having reviewed all the pleadings, much of the discovery and having heard from counsel during the various sessions where Plaintiffs were afforded an opportunity to expound on their various theories, the Court has come to the conclusion that the Settlement is fair and adequate for all the reasons set forth in this opinion including the opinion of the undersigned that the merits of the Class' case are indeed questionable.

The amount of compensatory payments provided under the Settlement ($2.2 million) is only a small fraction of the potential recovery if all premiums and associated charges were found unlawful. Combining all payments to be made by Defendants ($7.5 million which is over 10% of Defendants' consolidated net worth), however, more than triples the direct monetary obligations of Defendants. The equitable relief is significant, including both a myriad of required disclosures and an abandonment of fees appearing to be statutorily authorized. Inasmuch as the *Bryant Jones* case originally initiated these proceedings, and further, inasmuch as a tentative settlement was reached in that case and although the settlement was, in the

end, avoided, this Court felt a need to consider the figures which were initially agreed upon in this earlier case in order to be reassured that the compensatory and equitable relief awarded in the case sub judice, at the very least, rise to the level of that initially agreed upon in this earlier case. At the outset of this inquiry the Court is aware that today's class is considerably larger than the *Jones* class and, therefore, any merit in juxtaposing the two cases is diminished. Nevertheless, according to documents provided, the final settlement agreement proposed in the *Bryant Jones* case provided for a compensatory damages fund of $1,500,000, a punitive damages fund of $3 million dollars and an Attorneys' Fees Fund of $900,000 and twenty six elements of equitable relief. In this case the Settlement Agreement provides a compensatory damage fund of $2.2 million, a punitive damage fund of $4.4 million and an Attorneys' Fees Fund of $900,000 which does not represent an increase in this case vis-a-vis the *Jones* case notwithstanding an increase in monetary damages. As to injunctive relief, the specified seventy items of relief are more comprehensive here than they were in this earlier litigation and the proposed settlement therein. The Court recognizes, of course, that the settlement in *Jones* was thwarted for reasons which remain unclear. The Court further understands that what occurred in the initial class action has no precedential value here, but the thought processes of both class counsel and defense counsel in this earlier action underscores what this Court has concluded independently of this earlier action, which is, that the Settlement in this case is reasonable, fair and adequate.

Objectors principally consist of counsel attempting to pursue competing identical claims. *See In re Prudential Ins. Co. of America Sales Practices Litigation,* 148 F.3d 283, 318 (3d Cir.1998) (that "most vociferous objectors are ... litigants represented by counsel in cases that compete with or overlap [class] claims" a factor weighing in favor of approving settlement). The incentive for the competing actions emphasized by objectors' counsel is alleged entitlement to punitive damages. Setting aside whether such an outcome is likely, contentions of greater indi-

vidual entitlement to punitive damages do not demonstrate that the Settlement is unreasonable. The legal questions concern whether in light of the alleged reprehensibility of the Defendants' conduct, the amount of punitive damages adequately serves the penal and deterrent purposes of punitive damages. The $4.4 million stipulated in the Settlement unquestionably falls within such an arguable range.

The proponents of the Settlement have generally satisfied their burden to demonstrate the Settlement is fair, adequate and reasonable. The Court declines, however, to approve the Settlement Agreement with the release of claims provision as presently submitted. The release of claims provision should be modified to expressly exclude claims against American Federated, if any, for alleged failure to pay insurance benefits. Further, while not addressing the Settlement Agreement per se, the class certification should be modified to clarify the scope of the claims covered which would also necessitate some modification of the release. (P. 81, *infra*)

### The Continued Certification of the Mandatory Class

The Norris/Sakalarios group of state court plaintiffs (66 persons) and the *Arbuthnot/Barnes* group of state court plaintiffs (656 persons) represented by class counsel in *Bryant Jones* unsuccessfully appealed from the September 9, 1998 class certification order and concomitant order staying parallel proceedings. (P. 4–8, *supra*) On September 20, 2001, this Court on remand afforded the foregoing persons and other Class Members a hearing to present evidence and arguments addressing the continued propriety of class certification. (Exh. D–38, p. 7; P. 8–12, *supra*) Participants in the September 20, 2001 hearing constitute a significant majority of the Class Members objecting to the Settlement. (Compare P.8–12 with P. 17–19, *supra*) In conjunction with and at the August 27, 2002 and December 9, 2002 fairness hearings, the Court afforded all objectors opportunity to present additional evidence and arguments concerning mandatory participation

in the Class and therefore in the Settlement. (P. 17–21, *supra*)

### The Objectors' Challenges to Continued Class Certification

Objectors do not contend this proceeding should not be certified as a class action under Rule 23. They do not contest the presence of the four Rule 23(a) requisites of numerosity, commonality, typicality and adequacy of representation. Objectors do raise adequacy of representation issues in the context of an allegedly inadequate settlement. Some objectors also posed questions concerning the alleged necessity of subclasses to address bad faith and wrongful foreclosure claims. For the reasons explained above (P. 61, 62, *supra*), these purported claims falling outside the present controversy do not raise adequacy of representation concerns.[11]

Objectors assert the Court erred in not certifying the Class under Rule 23(b)(3). Objectors argue they must be afforded the right to opt out of the Class to maintain their own litigation. In contending the Court erred in certifying the Class under Rule 23(b)(1)(A) and Rule 23(b)(2), objectors never directly address the Court's findings in the September 9, 1998 opinion explaining the reasons for such certification. (Exh. D–20) Objectors erroneously accuse the parties of orchestrating equitable relief in the Settlement Agreement to permit mandatory class certification. Yet, despite having been afforded multiple opportunities to substantiate their positions, objectors unpersuasively address mandatory class certification issues in only a conclusory fashion without adequate support of their claims as pleaded and presented on the record. The same is true for objectors' regarding due process principles in arguing for opt-out rights.

### Continued Class Certification Under Rule 23(b)(1)(A)

The Court laid out the bases for Rule 23(b)(1)(A) certification in its 1998 certification opinion. (Exh. D–20, p. 13–18; P. 4,5, *supra*) Among other things, the Court characterized the present action as among those commonly identified as "practical candidates" for Rule 23(b)(1)(A) certification. (Exh. D–20, p. 13–14) The Court noted other judicial decisions affording Rule 23(b)(1)(A) treatment in controversies addressing standardized, preprinted contracts or uniform business practices. (Exh. D–20, p. 14) The Court also emphasized the presence of multiple lawsuits challenging Tower's business practices which defendants maintain were uniformly implemented because of law and practical circumstances. (Exh. D–20, p. 15–16) Objectors say nothing about these determinative Rule 23(b)(1)(A) factors.

Although the objectors engage in a boilerplate discussion of Rule 23(b)(1)(A) they do not adequately confront the circumstances before the Court. As an example, they contend that Rule 23(b)(1)(A) is inapplicable "because one jury's decision to award damages and another jury's decision not to award damages (or to award damages in a different amount) do not 'establish incompatible standards of conduct for the party opposing the class.'" (Docket No. 148, p. 14–15)[12] Although this contention correctly states an abstract legal proposition it does not have probative value regarding the facts before this Court.

Objectors ignore the pendency of multiple competing actions which do indeed create the

---

11. The Class Representatives borrowed money from Tower, pledged collateral to secure the loans, and obligated themselves to purchase property insurance and credit life or disability insurance which they contend was forced upon them through deceptive practices. (Exh. P–1, p. 6–7, exh. A; exh. P–2, P–3) The Class Representatives' status and the claims they are pursuing are no different than those of the Class Members, including objectors. Hence, Class Counsel appropriately requested that Claudia Smith (Love) and Wilbert Walker be substituted as the Class Representatives; the Court entered the order of substitution on November 19, 2001.

12. This quotation appears in the submission of objectors Crystian and Shaffer. Other objectors advance this same erroneous proposition. Because counsel for Crystian and Shaffer took the lead at the August 27, 2002 fairness hearing in challenging the mandatory certification and other objectors adopted her arguments (8/27/02 Tr. p. 230, 243–44, 279, 305), the Court specifically references particular contentions of Crystian and Shaffer as those of objectors generally.

risk of different courts establishing incompatible standards of conduct for Tower and American Federated. Objectors incorrectly state "the Court's reasoning does not support mandatory certification of damages claims because such reasoning would apply to *any* situation in which more than one plaintiff sued a defendant for damages arising from the same event ...." (Docket No. 148, p. 15–16) The Court recognized this controversy substantially involves how Tower has and will in the future do business. The Court emphasized "virtually every parallel action seeks injunctive relief," including separate demands of five different state courts for "a court-ordered plan establishing future procedures for insurance placement." (Exh. D–20, p. 15–16)

Plaintiffs' claims, including objectors' claims, cannot be construed at this late date as limited to separate proceedings for damages tied to the "same event." The claims here are not damages actions for a disastrous event affecting many people. The primary issue is not one of whether one jury finds damages to be owed for past conduct and another does not. At stake is how Tower could act prospectively if confronted with conflicting findings, including conflicting court-ordered plans establishing the future policies and practices to be followed. Such overriding questions are what led this Court to conclude "this controversy squarely falls under Rule 23(b)(1)(A)." (Exh. D–20, p. 15)

Objectors erroneously suggest *Allison* precludes Rule 23(b)(1)(A) certification here. They quote from an *Allison* footnote: " 'Given the individual-specific nature of the plaintiffs' claims for compensatory and punitive damages, we perceive no risk of inconsistent adjudications or incompatible standards of conduct in having those claims adjudicated separately.' *Allison*, 151 F.3d at 421 n. 16." (Docket No. 148, p. 17) *Allison* denied certification in an employment discrimination action involving individualized claims for dispa-

rate treatment. Both whether damages (compensatory and punitive) would be awarded and the amounts of any such damages were driven by individual employees' circumstances. *See Allison*, 151 F.3d at 416–18, 420.[13] *Allison's* facts are foreign to those here involving readily calculable monetary relief based on insurance premiums paid and punitive damages based on the alleged egregiousness of the uniform policies consistently applied to all Class Members. The Court has more thoroughly addressed *Allison* in the 1998 certification opinion. (See Rule 23(b)(2) discussion of *Allison* in 1998 certification opinion, exh. D–20 at 20–21)

Nor do the other cases cited by objectors undermine the Rule 23(b)(1)(A) certification. The three decisions[14] referenced by Objectors stand for the proposition that multiple actions for damages raising only the prospect of different damages verdicts do not create the requisite risk of establishing incompatible standards of conduct for the party opposing the class. The *Bendectin* case involved numerous claims for monetary damages arising from birth defects allegedly caused by the prescription drug Bendectin. In this context of product liability claims, the court merely concluded "the fact that some plaintiffs may be successful in their suits against a defendant while others may not is clearly not a ground for invoking Rule 23(b)(1)(A)." *In re Bendectin*, 749 F.2d at 305. *McDonnell–Douglas* is even more limited. That action addressed wrongful death claims for an airplane crash. Again, the holding enforced the proposition (not before this Court) that "independent tort claims arising out of the same occurrence and [which] assert only liability for damages" are not to be certified under Rule 23(b)(1)(A). *See McDonnell–Douglas*, 523 F.2d at 1085–86. *Dennis Greenman Securities* addressed a securities fraud perpetrated over a four-year period. The court understandably found competing damages actions arising out of fraud did not create

---

**13.** Indeed, because of the predominance of individual-specific issues, Rule 23(b)(3) certification, an undisputed given here, was also unavailable in *Allison*. *See* 151 F.3d at 419–20.

**14.** The three cases cited by objectors are *In re Dennis Greenman Securities Litigation*, 829 F.2d

1539 (11th Cir.1987); *In re Bendectin Liability Litigation*, 749 F.2d 300 (6th Cir.1984); and *McDonnell–Douglas Corp. v. U.S. District Court for Central District of California*, 523 F.2d 1083 (9th Cir.1975).

inconsistent standards for future conduct merely "because a defendant may be found liable to some plaintiffs and not to others." *Dennis Greenman Securities,* 829 F.2d at 1545.

### Continued Class Certification Under Rule 23(b)(2)

Objectors contest the Rule 23(b)(2) certification essentially through two related approaches. First, utilizing the amended complaint, the Settlement Agreement and characterizations of individualized damages claims, objectors erroneously argue equitable relief does not predominate under *Allison.* Second, relying on two post-*Allison* Fifth Circuit decisions issued after the Court's 1998 certification opinion,[15] objectors contend the Court erroneously failed to certify the Class on a claim-by-claim basis and the injunctive relief provisions are irrelevant to Class Members not presently in a contractual relationship with Defendants. There is some merit to contentions of no claim-by-claim certification which will be discussed below. Otherwise, the record and case law, including the Fifth Circuit's post-certification decisions in *Bolin* and *James,* continue to warrant certification under Rule 23(b)(2).[16]

### The Predominance of Injunctive Relief

■■■ Objectors challenge findings of the predominance of injunctive relief under *Allison* in basically three ways. (i) They contend the parties' emphasis on equitable relief in the Settlement Agreement is "pure sophistry" in light of the demands for damages in the amended complaint. (ii) Objectors assert

the broad release in the Settlement Agreement of all kinds of damages claims portrays the predominance of damages over equitable relief. (iii) They maintain their claims are "highly individualized" which bars certification under *Allison.*

■■■■ Objectors erroneously suggest the parties, and the Court, are improperly looking to the Settlement Agreement rather than to the amended complaint to substantiate findings of the predominance of equitable relief. The Settlement Agreement is predicated on the amended complaint.[17] That multiple counts of the complaint may demand damages for alleged wrongful conduct is not determinative. The same alleged wrongful conduct, which is continuing, is also the basis for the injunctive relief. Objectors' separation of the complaint into 18 counts for damages as contrasted with a single count for injunctive relief is without merit. The separate count for injunctive relief simply highlights the particular equitable relief justified by the continuing wrongful conduct alleged throughout the complaint.

Objectors' contentions of equitable relief being nothing more than "an afterthought to the principal claims for damages" (Docket No. 148, p. 6) conflict not only with the present class action complaint but with the *Bryant Jones* class action complaint and numerous other complaints of objectors. The subject complaint, the *Bryant Jones* complaint and seven state court complaints on behalf of 714 persons each contains the following summary description of the action in the introductory portion of the pleading:

---

**15.** These two post-*Allison* decisions are *Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970 (5th Cir. 2000), and *James v. City of Dallas,* 254 F.3d 551 (5th Cir.2001).

**16.** As with the Rule 23(b)(1)(A) discussion, various objectors' positions on Rule 23(b)(2) applicability are included within the more comprehensive challenges of Crystian and Shaffer. The focus here will be on the Crystian and Shaffer written and oral submissions recognizing that the other objectors' positions are likewise being addressed. (Compare Docket No. 144, ¶ 5; Docket No. 145, ¶¶ 1 & 3; & Docket No. 152, ¶ 1 with Crystian & Shaffer submission identified as Docket No. 148 & 8/27/02 Tr. p. 232–42)

**17.** The Settlement Agreement is to be evaluated in the context of the reasonableness of the pro-

posed Settlement in light of the Class' claims. The Settlement Agreement does not serve as the basis for class certification. That is the function of the amended complaint as pursued by the named plaintiffs seeking to serve as class representatives. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). For this same reason the limitation of the injunctive relief in the Settlement Agreement to a five-year period is not problematic. That the injunctive relief is not permanent goes to the reasonableness of the Settlement but not to the genuineness of the equitable relief demands. The time period covered by the injunctive relief, just like the specific practices enjoined, was the subject of compromise.

This is a combination contract, tort, and statutory action under the laws of the State of Mississippi, and under the common law of the State of Mississippi, sounding as a breach of contract, and tort for tortious breach of implied covenants of good faith and fair dealing, breach of fiduciary duties, civil conspiracy, negligence, fraudulent misrepresentation and/or omission, negligent misrepresentation and/or omission, tortious interference with a contract, unjust enrichment, restitution, declaratory relief, injunctive relief, equitable relief, and punitive damages.

(Exh. D–3(a), (i), (j), (*l* )-(*o*)) [18] Thus, the equitable demands of unjust enrichment ·and for restitution tie the contemplated compensatory damages to the amount of insurance premiums paid; the words "compensatory damages" do not even appear in the summary description of the claims; punitive damages are being sought for the same conduct alleged to result in "unjust enrichment" and to warrant "restitution, declaratory relief, injunctive relief, [and] equitable relief." (P. 1,2 *supra*)

Objectors' emphasis on the breadth of the release of claims language in the Settlement Agreement is misplaced. Defendants are obligating themselves to pay $7.5 million and to substantially limiting future operations to defined practices for a five-year period. The release language is therefore understandably broad. The fundamental issue is release from liability from loan/insurance placement practices. The release is not limited to damages actions; it simply includes them. The release language is properly grounded in the allegations of the amended complaint.[19] Defendants reasonably insisted on inclusion of

the word "damages" regardless of whether the Class' demand for monetary relief is termed an equitable or nonequitable remedy or whether Defendants' monetary exposure for collection of insurance premiums is best described as restitution, disgorgement, unjust enrichment or compensatory damages. (See 1998 certification opinion, exh. 20 p. 19–20, addressing monetary liability as extension of equitable remedy and incidental nonequitable relief.) [20]

Objectors attempt to invoke *Allison* to bar Rule 23(b)(2) certification by contending "the Class Members' damages claims are highly 'individualized,' and cannot be addressed through a 'group remedy.'" (Docket No. 148, p. 9; 8/27/02 Tr. p. 234) Their allegations purporting to substantiate individualized compensatory damages claims, however, do not support their contention. Objectors Crystian and Shaffer assert:

[A]t trial, each plaintiff would be required, among other things, to prove that he or she entered into a loan with one or more of the defendants, and that their particular loan documents violated TILA, the FDCPA, and a wide range of common-law duties. Resolving the class members' common-law claims would require knowing whether the class member was or was not told that insurance was optional (or whether the class member even knew that "packing" had occurred), whether the class member relied on the misrepresentations of the defendants, whether the terms of the particular loan were usurious, and so forth. Moreover, as to both the federal and common-law claims, the court would be required to consider the extent of the individual damages suffered (including

---

**18.** The quotation in the text is taken verbatim from a representative state court complaint. The subject class action complaint and the *Bryant Jones* class action complaint contain virtually identical language but also include allegations of federal claims.

**19.** The Court previously recognized, however, the release was perhaps overly broad as to claims for failure to pay insurance benefits and declined to approve the Settlement Agreement without clarification of the release to except such claims.

**20.** Objectors somewhat frivolously suggest the parties' establishment of the "Compensatory

Damages Fund" under the Settlement Agreement "amounts to a concession" that Rule 23(b)(2) cannot be satisfied. From their initial class certification motions and related submissions forward, the parties have consistently maintained the monetary relief, whether termed equitable or nonequitable, was readily capable of computation without the necessity of individualized hearings. (Exh. D–20, p. 18–21) As such, any so-called "damages" are "incidental" under *Allison*. Moreover, *Allison* recognizes that claims for punitive damages, like those here, may also be "incidental." *See Allison*, 151 F.3d at 417–18. (See also exh. D–20, p. 21)

questions relating to the length of each class member's loan, the type or quality of the personal property insured, mitigation, mental suffering and other consequential damages, and the like), and a host of other matters specific to that class member's claims.

(Docket No. 148, p. 9–10)

All of the above alleged "individual" issues are properly before the Court on a classwide basis. Every Class Member is a Tower borrower. While perhaps not identical in every respect, the loan documents are substantially the same concerning the material issues. The Class Representatives contend Tower wrongfully coerced them to purchase credit insurance. (Exh. D–1, ¶¶ 8–10, 16, 19, 55, 103) To assert that a Class Member was not told insurance was optional (particularly in light of the indisputable written disclosures) does not create an individual issue regarding reliance on an alleged fraudulent omission. (P. 38–39, *supra.*) There are no individualized claims for "mental suffering and other consequential damages, and the like." The Class Representatives do not allege any; no objectors substantively suggested any; and no basis exists for judicial speculation regarding any such individualized claims.[21] As previously found by the Court, the Class Members' claims "are not individualized claims under *Allison,*" for the damages amounts are "readily capable of computation by following the objective standards of calculating the amounts of insurance premiums charged plus the associated finance costs." (Exh. D–20, p. 20) Such damages are in the ·nature of a "group remedy" as they "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." *See Allison,* 151 F.3d at 415.

### Application of Bolin and James

Objectors urge *Bolin* requires decertification under Rule 23(b)(2) for essentially four reasons: (i) Class Members' claims based on individual circumstances cannot be certified under the claim-by-claim approach required by *Bolin.* (ii) Claims of Class Members no longer in a contractual relationship with Defendants cannot be certified because these Class Members do not face further harm from Defendants' actions. (iii) Through "shoehorning" this alleged damages action under Rule 23(b)(2) Defendants are improperly attempting to purchase res judicata. (iv) Statutory claims for which injunctive relief is not an available remedy are included in the certification. Except for several federal statutory claims for which injunctive relief is unavailable, objectors' contentions are meritless.

Objectors' continued assertion of alleged individual claims repeats the arguments previously addressed in the context of *Allison.* *Bolin* follows *Allison,* including quoting extensively from *Allison,* in identifying what constitute "incidental damages" for purposes of whether injunctive relief predominates. *See Bolin,* 231 F.3d at 976 (quoting *Allison,* " 'incidental damages' " are those " 'capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances' "). Objectors' conclusory assertions that the damages claims "depend entirely on the Class Members' individual circumstances" are unconvincing. Further, the Class Members are pursuing TILA claims for statutory damages which are otherwise statutorily capped as to the Class at $500,000. *See* 15 U.S.C. § 1640(a)(2)(B). *Bolin* recognized that the supra-compensatory damages autho-

---

**21.** Crystian is a five-time Tower borrower. who borrowed as recently as 2001. Shaffer is a six-time borrower with an existing relationship with Tower today. It is not credible to suggest borrowers, particularly repeat borrowers such as Crystian and Shaffer who continued to borrow after commencement of their state court actions, endured "pain and suffering" for allegedly having to purchase insurance they did not want. Neither the affidavits of Crystian or Shaffer nor of any other objector intimate any such pain and suffering. Special counsel for Crystian and Shaf-

fer also mischaracterized the instances of when her purported clients borrowed from Tower. (Compare Docket No. 148, p. 3, with 12/9/02 Tr. p. 10–11, exh. D–57 & exh. D–58.) Further, the unfounded allegations of Crystian and Shaffer regarding unliquidated damages conflict with the representations of counsel for the group of 693 objectors who depicted the value of the compensatory claims to be from several hundred to perhaps several thousand dollars, an obvious reference to the amount of insurance premiums and associated charges in issue. (P. 20, *supra*)

rized by the ... TILA require no individualized calculation, but are awarded to the class as a whole. *Bolin*, 231 F.3d at 977. *Bolin* rejected Rule 23(b)(2) certification under TILA because injunctive relief was not being genuinely sought, not because damages could not be readily computed. Objectors again fail to offer any credible validation of purported common law claims dependent on individualized circumstances.[22]

Objectors disregard the allegations of the amended complaint, the allegations of their own state court complaints and their presentations at the hearings in contending Class Members not presently in a contractual relationship with Defendants do not benefit from injunctive relief. The Class Representatives maintain they are fundamentally attacking the alleged practice of "insurance packing." (Exh. D–1, ¶¶ 8, 23) Insurance packing is allegedly the result of "the use of deceptive or coercive marketing practices." (Exh. D–1, ¶ 8) Among other things, the amended complaint alleges Tower falsely advertises and solicits borrowers which leads to indebtedness for which the true costs of the loan are not disclosed. (Exh. D–1, ¶¶ 14, 103(a), 106(c)) The Class complains of loan "flipping" practices. The requested injunctive relief seeks the termination of the alleged predatory practices and the restructuring of future practices to assure borrowers are not victimized by insurance packing. The *Bryant Jones* class action complaint was filed in 1996 and the present class action complaint was filed in 1998. That a Class Member may not be presently indebted to Tower does not render injunctive relief addressing the challenged practices, including loan solicitation, meaningless.

Objectors' state court complaints likewise reflect an institutional assault, including the attack of alleged "insurance packing" allegedly perpetrated through "the use of deceptive or coercive marketing practices." (E.g., exh. D–3(o), ¶¶ 13, 27; 8/27/02 Tr. p. 286) Objectors, too, complain of false advertising and solicitations. (E.g., exh. D–3(o), ¶¶ 18, 83(a), 87(c)) They also assert "flipping."

(E.g., exh. D–3(o), ¶ 29; 8/27/02 Tr. p. 286) Objectors demand injunctive relief to terminate existing predatory practices and to restructure future practices, specifically asserting the rights of "future borrowers." (Exh. D–3(a) thru D–3(k), count XII)

At the September 20, 2001 hearing addressing Class Member challenges of the class certification, objectors largely complained of Tower's continued solicitation of borrowers through alleged predatory practices. (Exh. D–38, p. 21–24, 55–56, 62) They criticized the absence of injunctive relief remedying such practices. (Exh. D–38, p. 23–24) Objectors' counsel emphasized the importance of judicial intervention due to the borrowers' alleged inabilities to protect themselves and the absence of other sources of credit. (Exh. D–38, p. 38, 43, 51–52) Objectors' counsel described their clients as having been victimized by the same practices as the Class Representatives. (Exh. D–38, p. 61) At the August 27, 2002 fairness hearing, objectors similarly complained that all had been victimized by "Defendants' clearly institutionalized and very clearly improper ... predatory lending practices ... the packing and the flipping and those sorts of things." (8/27/02 Tr. p. 286) The demands for judicial intervention to halt existing practices and to restructure future practices are not limited to persons presently indebted to Tower.

Every plaintiff, here and in the state court complaints, assails the alleged practice of loan "flipping." They define "flipping" as "the practice of encouraging the borrower to refinance, or renew, the balance due on the loan with a new loan at frequent intervals in order to allow the lender to pack additional insurance premiums on the new loan and in order to allow the lender to receive additional interest, or costs, on the same amount of funds loaned." (Exh. D–3(o), ¶ 29) The emphasis is on Tower encouragement of borrowers to borrow again to enable Tower to allegedly extract more charges and fees. Objectors' across-the-board attack of the practice evidences they contend they have

---

**22.** Objectors' contentions concerning the alleged necessity of individualized hearings on the FDCPA claims as referenced in *Bolin* are moot. Because the Court has determined below that injunctive relief is not available under the FDCPA, no FDCPA claim is being finally certified under Rule 23(b)(2).

been, or fear that they will be, victimized by the practices. Objectors' allegations of flipping on behalf of some 800 persons themselves depict the class-based nature of the complaint. Their own requests for injunctive relief are to be understood in this light.

That today, some Class Members may not presently have an outstanding loan balance does not undo the significance of injunctive relief, generally or as to them. The scope of the borrowers' multiple challenges of ongoing practices, the certainty that all Class Members will be solicited, and the substantial probability that the vast majority of Class Members are or will be repeat borrowers (P.1—4, *supra*; P. 49, *supra*) adequately demonstrate the genuineness of class-based injunctive relief under *Bolin*.[23]

Objectors have employed a host of descriptives to attack the injunctive relief sought under the amended complaint and provided in the Settlement Agreement. The attacks range from "meaningless," "an afterthought," "a facade," "transparent," to "pure sophistry." Citing *Bolin*, the stated concern is the alleged wrongful deprivation of opt-out rights which enables Class Counsel to acquire thousands of clients and affords the defendants protection under res judicata. (Docket No. 148, p. 14) Moreover, objectors emphasize that the nature of the injunctive relief warrants a very careful evaluation by the Court, especially in light of the agreement, in principle, by Class Representatives and Defendants as to the significance of injunctive relief both at the class certification stage and in the settlement. The Court agrees with the objectors in this regard and has given this and all aspects of the certification and settlement careful scrutiny for all the reasons set out at the very beginning of this memorandum.

The predominance of injunctive relief originally found by this Court (Exh. D–20, p. 18–21) continues to withstand scrutiny. The above findings and conclusions associated with the global challenges of institutional practices, the multiple demands for injunctive relief by not only the Class Representatives but also specifically by a number of objectors, and the absence of genuine individualized claims all substantiate the genuineness of injunctive relief.

Defendants cannot be faulted for seeking a comprehensive resolution of this controversy. The Defendants' counterclaim for declaratory relief addressing the lawfulness of their practices is understood. Circumstances prevailing then (as well as now) clearly warranted a unitary adjudication declaring Defendants' rights, duties and obligations in implementing uniform business practices dictated by law and practical circumstances. Defendants filed a motion apart from the named plaintiff, seeking certification under Rule 23(b)(1)(A) and Rule 23(b)(2). The Court's certification opinion granted Defendants' request for mandatory class certification. Rule 23(b)(2) provides for class certification if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief *or corresponding declaratory relief* with respect to the class as a whole." *See Allison*, 151 F.3d at 411 ("The rule is clear that claims seeking injunctive or declaratory relief are appropriate for (b)(2) class certification."). Unquestionably, Defendants' demand for declaratory relief seeks redress for injuries allegedly uniformly sustained across the Class. *See Bolin*, 231 F.3d at 975 (uniformity of injury across class renders notice and opt-out provisions of (b)(3) unnecessary). The injunctive relief in the Settlement Agreement, while it may grant more relief to the Class than legally required, constitutes the warranted declaration of Defendants' rights, duties and obligations sought in the counterclaim.

---

23. Such circumstances are a far cry from those in *Bolin* where the class was composed of *bankrupt* debtors who, "since 1988," had either "paid money to Sears post-petition, had property repossessed or garnished, or [had] expended legal fees connected with Sears's collection efforts." *Bolin*, 231 F.3d at 978. Obviously, "most" of that class consisted of persons not facing further harm from the defendants' actions. *Id.* Objec-

tors' reliance on *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 553–54 (5th Cir.2003), is similarly misplaced. In that breach of warranty action, "Fleetwood sold its motor homes over a limited period of time to limited number of purchasers." *Id.* at 554. There was no challenge of ongoing defendant practices or any prospect of future defendant conduct affecting any class member.

Moreover, it bears repeating that this controversy was initiated not by present Class Counsel but by *Bryant Jones* class counsel. *Bryant Jones* class counsel now represents the majority of objectors advancing virtually identical challenges in state court litigation. *Bryant Jones* class counsel, the former proponent of the necessity of injunctive relief, is working with special counsel on two fronts to accomplish a result which is contradictory to the relief sought by the *Bryant Jones* complaint, by their own state court complaints, and by the state court complaints of other counsel with whom they are collaborating.[24] The objectors now gainsay that which they once embraced. Nevertheless, this reversal in strategy does not cause this Court to come to the conclusion it has reached regarding the predominance of injunctive relief. Moreover, it is the opinion of the Court that the issue of mandatory class certification is wholly and independently supported by the record in this case.

■ Further regarding the necessity of claim-by-claim certification, *Bolin* found that "to determine whether damages predominate, a court should certify a class on a claim-by-claim basis, treating each claim individually and certifying the class with respect to only those claims for which certification is appropriate." 231 F.3d at 976. The court specifically noted that "the unavailability of injunctive relief under a statute would automatically make (b)(2) certification an abuse of discretion." 231 F.3d at 977, n. 39. Class certification is reexamined below in light of these teachings.

■ Injunctive relief would unquestionably be available (if liability were to be found) with respect to the Class' common law claims. *Bolin's* focus is understandably on the availability of injunctive relief under statutory causes of action. Injunctive relief is available for valid claims under the Sherman Act. *See, e.g., Kruman v. Christie's International PLC*, 284 F.3d 384, 397 (2d Cir.2002); *Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.*, 246 F.3d 752, 755–56 (5th Cir. 2001). Injunctive relief is also available for the Class' claims under the Truth–in–Lending Act. *See Guarte v. Furniture Fair, Inc.*, 75 F.R.D. 525, 529 (D.Md.1977).

■ As strongly suggested but not specifically held by the court in *Bolin*, injunctive relief is not available under the Fair Debt Collection Practices Act. *See Bolin*, 231 F.3d at 977 n. 39 and authorities cited therein (noting that, while the Fifth Circuit "has not definitively ruled on the issue, courts uniformly hold that the FDCPA does not authorize equitable relief"). Injunctive relief would also not be available to the Class under their federal mail fraud and due process claims for which they have no private right of action against Defendants. (See P. 356, *supra*.)[25]

Objectors assert that *James*,[26] as contrasted with the circumstances here, typifies an instance where monetary damages are "truly incidental." (8/27/02 Tr. p. 240–41) The court in *James*, of course, did not remotely suggest that the particular circumstances before them constituted the only factual scenario for Rule 23(b)(2) certification. Rather, the court specifically observed they were "guided in [their] 'predominance' analysis by the careful discussion of Rule 23(b)(2) set forth in *Allison*." *James*, 254 F.3d at 571. No new legal standards were established. In upholding the Rule 23(b)(2) certification, the court simply "conclude[d] that none of the concerns articulated in *Allison* bar[red] class certification." 254 F.3d at 572. Citing *Allison*, the court found the "requested relief [was] consistent with the group-oriented nature of the

24. Special counsel were engaged to represent objectors Crystian and Shaffer, persons represented by *Bryant Jones* counsel in the *Barnes* state court action. Special counsel were engaged to represent the group of 693 objectors, persons represented by *Bryant Jones* counsel in the *Barnes, Arbuthnot* and other state court actions. (P.18, *supra*) Mr. Sakalarios, who also represents a group of objectors with Mr. Norris, has also appeared on behalf of the group of 693 objectors. (Docket Nos. 152 & 153)

25. Injunctive relief is available under the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, but the Court is of the opinion the Class is not actively pursuing any such claims. (P. 356, *supra*)

26. See Citation on page 355, *supra*

alleged injury and present[ed] no conflict with the injunctive purposes of Rule 23(b)(2)." *Id.* As repeatedly explained, the same is true here.

The Fifth Circuit's post-*Allison* decisions rendered after the 1998 certification of the class in *Bolin* and *James* affirm the *Allison* principles on which this Court relied in certifying the Class under Rule 23(b)(2). The claim-by-claim certification requirements articulated in the decisions require this Court to modify the scope of the Rule 23(b)(2) certification as set forth above but not to abandon it.

### Due Process Rights

■ Objectors argue the mandatory class certification denies Class Members due process. They cite several United States Supreme Court decisions[27] and a Ninth Circuit decision[28] in support of their alleged constitutional right to opt out of the Class. These contentions, however, are unpersuasive. They rest on alleged rights of persons possessed of unliquidated, individualized, substantial damages claims. As already addressed (P, 20, P. 79–80, *supra*), there are no such claims here.

Objectors cite *Shutts* for the proposition that "in class actions seeking to bind plaintiffs with respect to 'claims wholly or predominantly for money damages,'" due process requires Class Members be afforded the opportunity to opt out. (Docket No. 148, p. 17) Objectors assert "Rule 23 codified the constitutional right to opt out for class members with damages claims" through Rule 23(b)(3). (Docket No. 148, p. 19) *Shutts* itself addressed a state law version of federal rule 23(b)(3). Thus, objectors' insistence on a due process right to opt out is largely one of rearguing the correctness of the class certifi-

cations under Rule 23(b)(1)(A) and Rule 23(b)(2), arguments already rejected.

Objectors emphasize Supreme Court observations in *Ortiz* concerning damages claims in a mandatory class. *Ortiz* involved a class erroneously certified under the "limited fund" concept of Rule 23(b)(1)(B). *Ortiz*, a personal injury action, addressed a class consisting of asbestos victims possessed of substantial damages claims. The value of such personal injury claims varied significantly among individuals depending on the nature of exposure to asbestos and the extent to which actual physical injury was present. The class even included unknown future claimants. The Court's due process concerns in that damages context are simply inapposite here.

■ *Allison* itself confirms that no due process right to opt out arises in a properly certified Rule 23(b)(1) or Rule 23(b)(2) class action. *See Allison*, 151 F.3d at 412, 413 n. 7, and authorities cited. Class Members here have no constitutionally-protected property right to personally vindicate their claims for monetary relief in separate litigation. Constitutional guarantees for absent members of a mandatory class are preserved through fulfillment of the adequacy of representation requirement of Rule 23(a) and the homogeneity requirements of Rule 23(b)(1)(A) and Rule 23(b)(2) associated with the necessary unitary adjudication of all claims. *See Allison*, 151 F.3d at 412–15.[29]

### Conclusion

The Court basically has three alternatives in addressing Settlement approval: (i) The Court may approve the Settlement Agreement as submitted. (ii) The Court may reject

---

**27.** The Supreme Court decisions are *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (Ginsberg, J., concurring in part and dissenting in part); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

**28.** The Ninth Circuit decision is *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir.1992), *writ dismissed as improvidently granted*, 511 U.S. 117, 114 S.Ct. 1359, 128 L.Ed.2d 33 (1994).

**29.** Moreover, beyond the class certification on the merits, Class Members here have been afforded additional "due process" through the Notice of Settlement and opportunities afforded to object to the Settlement. *See Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 507–08 (5th Cir.1981) (due process satisfied in Rule 23(b)(2) settlement when notice but no opportunity to opt out provided) (cited in *Allison* at 151 F.3d at 413–14, n. 7).

the Settlement Agreement in its entirety. (iii) The Court may reject the Settlement Agreement as submitted with suggestions which if accepted would lead to Settlement approval. Here, as set forth in the above findings and conclusions, substantial grounds exist for approval of the Settlement Agreement provided certain modifications are accepted by the Defendants.

The Settlement Agreement contemplated continued certification of a mandatory class under Rule 23(b)(1)(A) and Rule 23(b)(2) of all claims alleged in the amended complaint. In light of decisions of the United States Court of Appeals for the Fifth Circuit rendered after the Court's original 1998 class certification, this certification is overly broad. For the Settlement to obtain this Court's approval, the class must be recertified on a claim-by-claim basis consistent with the conclusions of law set forth above. (P. 87–88 *supra*) Such a certification will result in federal claims under the Fair Debt Collection Practices Act, the Civil Rights Act of 1991 and the federal mail fraud statute no longer being certified. The certification of the remaining claims would continue to be under Rule 23(b)(1)(A) and Rule 23(b)(2). No Class Member would be permitted to opt out of the Settlement.

The Court has also determined that the scope of the proposed release of claims is overly broad. For the Court to approve the Settlement, claims, if any, associated with the Fair Debt Collection Practices Act, or the Civil Rights Act of 1991, or the federal mail fraud statute, must be expressly excluded from the release. The same is true of claims, if any, arising from the payment or nonpayment of benefits under policies of insurance issued by American Federated.

Otherwise, the Settlement Agreement is fair, adequate and reasonable. With the Court's modifications if accepted, the Settlement Agreement will be approved. If Defendants agree to the Court's suggested modifications to the Settlement Agreement, judgment will be entered consistent with these Findings of Fact and Conclusions of Law. From the filing of this memorandum, the Defendants have three calendar days within which to notify the Court of their position regarding suggested modifications. If accepted, the Court will enter final judgment immediately thereafter.